[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1067 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1068 
On November 22, 2000, Danny L. Wiginton, individually, and David Wiginton and Gary C. Huckaby, as Trustees of the Danny L. Wiginton Irrevocable Family Trust (Danny and David Wiginton and Gary *Page 1069 
Huckaby are hereinafter together referred to as "the Wigintons"), sued Carter Stockton, Flo U. Stockton, Benton A. Stockton, the Stockton Family Limited Partnership (these defendants are hereinafter together referred to as "the Stocktons"), and CKPD Development Co., LLC ("CKPD"). The Stocktons filed a counterclaim against the Wigintons. The Wigintons and the Stocktons amended their claims several times to assert a variety of claims against each other. In essence, in addition to damages for torts such as interference with a business relationship and fraud or suppression, the Wigintons sought various forms of declaratory relief pertaining to a right of first refusal Danny Wiginton owned with regard to certain real property owned by one or more of the Stocktons. In addition, the Wigintons amended their complaint to add as defendants Mark A. Jackson, Michael Samples, Charles J. Graffeo, Samples Properties, Inc. ("Samples Properties"), Heritage Bank, and CKPD Tenancy in Common (these parties, together with CKPD, are hereinafter referred to as "the CKPD defendants"). In their counter-claims, the Stocktons sought certain declaratory relief in addition to asserting claims for damages on a number of tort and breach-of-contract claims.
During the pendency of this action, the Wigintons and the CKPD defendants entered into a settlement agreement. As a result of that agreement, the Wigintons' claims against the CKPD defendants were dismissed. Thereafter, the Stocktons amended their claims against the Wigintons and also filed cross-claims against the CKPD defendants in which they sought the reformation of an April 4, 2000, ground lease ("the ground lease") and damages.
The parties conducted extensive discovery and submitted voluminous motions to the trial court. The CKPD defendants moved for a summary judgment on the Stocktons' claims against them, and the Stocktons moved for a summary judgment on all of their claims. The Wigintons moved for a partial summary judgment with regard to some of their claims against the Stocktons.
On January 13, 2005, the trial court entered an order that detailed the nature of the parties' claims and the legal bases for its resolutions of those claims. In that order, the trial court granted the Wigintons' motion for a partial summary judgment, granted the CKPD defendants' motion for a summary judgment, and denied the Stocktons' motion for a summary judgment. The trial court specifically listed the remaining claims to be resolved at the scheduled trial on the Wigintons' claims against the Stocktons. The Stocktons filed a "postjudgment motion," which the trial court purported to deny.[1]
Thereafter, the Stocktons and the Wigintons notified the trial court that they had reached a settlement with regard to the Wigintons' claims that had not been resolved in the January 13, 2005, order. On February 28, 2005, the trial court entered an order dismissing those claims asserted by the Wigintons that had not been resolved in the January 13, 2005, order. Because it resolved the last of the remaining pending claims among the parties, the *Page 1070 
February 28, 2005, order constituted a final judgment in this matter.
The Stocktons timely appealed to the Supreme Court of Alabama, which transferred this appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975. On appeal, the Stocktons only raise issues pertaining to their claims against the CKPD defendants.
The trial court's recitation of the basic underlying facts of this dispute, quoted below, are supported by the record.[2]
 "On June 29, 1984, Danny Wiginton (Wiginton') purchased a house at 558 Franklin Street in the city limits of Huntsville, Alabama from Mrs. Flo Stockton. At that time, Mrs. Stockton and/or other members of the Stockton family also owned two separate but contiguous tracts of land on Madison Street on the west side of the Franklin Street house ('Tract 1' and `Tract 2'). At the time of acquiring the Franklin Street house, Wiginton obtained a right of first refusal to purchase only Tract 1 from Mrs. Stockton; however, the agreement required Wiginton to purchase Tract 2 as well if the Stocktons desired to sell it along with Tract 1.
 "[Carter] Stockton testified that the Stockton Family Limited Partnership considered developing Tracts 1 and 2 as a commercial real estate property and putting a building on these tracts, but concluded that a third tract of land (to the west of the Franklin Street house and contiguous to Tract 2) was necessary in order to have a feasible project. In 1999, the Stocktons acquired the third tract of land ('Tract 3'). Tract 1 is nearly twice as big as Tracts 2 and 3 combined, having 155 front feet on Madison Street as contrasted with 85.97 feet.
 "On April 4, 2000, CKPD and the Stockton Family entered into a ground lease (the `Ground Lease') under which CKPD leased Tracts 1, 2 and 3 from the Stockton Family (the `Leased Land,' as appropriate hereinafter). Through the Ground Lease, the Stockton Family leased to CKPD Tracts 1, 2 and 3 for a 40-year term, with three 10-year options in favor of CKPD for a total potential term of 70 years. The Ground Lease, as well as all attachments incorporated into it (including the Option to Purchase granted to CKPD in year fifteen of the Ground Lease) was drafted by Stockton and/or counsel for Stockton. The Ground Lease gave CKPD the right to construct `structures, buildings, and other improvements on the Leased Land, at [CKPD's] sole cost and expense, without the prior approval of [the Stockton Family].' The Ground Lease states that `it is understood and agreed that the primary purpose for which the Leased Land has been leased is for the development and construction of an office building,' and further, specifically limited the use of the Leased Land `by CKPD or any permitted subtenant for the sole purpose of conducting the business of an office building.'
 "The total monthly rent amount to be paid by CKPD to the Stockton Family for the first ten years of the Ground Lease is Six Thousand, Five Hundred Dollars ($6,500.00) for the entirety of the Leased Land. This total sum of rent due is comprised of a separate amount allocated for each individual tract of land, *Page 1071 
the formula for which Stockton admits that he devised. During years one through ten of the Ground Lease, Stockton assigned a monthly lease rate of One Hundred Dollars ($100) to Tract 1 of the Leased Land. Monthly rent on Tracts 2 and 3 were priced at Three Thousand, Two Hundred Dollars ($3,200) per tract during years one through ten. The monthly rent on tracts two and three escalated three times during years eleven through forty of the Ground Lease, while the monthly lease rate of tract one remained at $100.
 "As of November 2004, the Stockton Family had cashed and/or accepted approximately fifty-four monthly rental checks in the amount of Six Thousand, Five Hundred Dollars ($6,500) during the period of the Ground Lease. At no time did the Stockton Family ever return any of the monthly rental checks to CKPD.
 "Through the Ground Lease's Option to Purchase the Leased Land in year 15, the purchase price of Tract 1 was set by the Stockton Family at One Million, Three Hundred Thousand Dollars ($1,300,000), while the purchase price for tracts two and three were set at Ten Dollars ($10) each. [Carter] Stockton testified that the predominant factor in valuing property is its income stream from rents, and that he seeks to recover a 10 to 12 percent capitalization return on his rental property. [Carter] Stockton admitted that assuming a 10 percent return, the value of Tracts 2 and 3 considering the rents in the Ground Lease would be $768,000, while Lot 1 would have a value of $12,000. [Carter] Stockton admitted that any offer he makes to sell Tract 1 that carries with it the option to buy Tracts 2 and 3 must be presented to Wiginton as including those options.
 "[Carter] Stockton testified that his objective in entering the Ground Lease was to be in a position to retain for [sic] at least the income on Tracts 2 and 3 and to do a like-kind exchange as to Tract 1, and to sell the non-income producing property received for Tract 1 for [one] million dollars and use it to acquire other income-producing property so that they would have two streams of income in the Limited Partnership. When questioned as to why [he] could not treat the Leased Land, `as one tract, not separated out the rental values and the option prices, just had the one collective option price, one collective rental value for this whole three parcels, and done a 1031 exchange on the whole thing,' [Carter] Stockton testified that he could not have done this because it `would not have retained the income on tracts 2 and 3.'
 "Through a pro tanto settlement agreement relating to and dismissing the [Wiginton] plaintiffs' claims in this litigation against the CKPD defendants, CKPD assigned any and all interest it had pursuant to the Ground Lease's Option to Purchase the Leased Land in year fifteen of the Ground Lease. As a result of the assignment of the Option to Purchase, Wiginton now holds the Option to purchase all three tracts of the Leased Land.
 "On or about October 23, 2000, CKPD assigned a twenty-five percent (25%) undivided interest in CKPD's right, title and interest in and to the Ground Lease to Samples Properties (the `Partial Assignment'), as specifically permitted by Section 13.10 of the Ground Lease. CKPD also filed a Notice of the Partial Assignment in the Madison County Probate Court on or about December 18, 2000. A copy of the Partial Assignment was forwarded to [the] Stockton[s] via letter in or around December of 2000. *Page 1072 
[Carter] Stockton admitted that he was aware of the Partial Assignment and recognized in correspondence to Regions Bank that the three tracts of land were `currently ground leased to CKPD Development Co., LLC and Samples Properties, Inc.' [The] Stockton[s] took no action concerning the Partial Assignment until March 16, 2004.
 "On or about December 15, 2000, CKPD and Samples Properties executed an agreement memorializing their formation of a tenancy in common, or the previously-defined `CKPD Tenancy.' On December 18, 2000, the CKPD Tenancy filed a Notice of the CKPD Tenancy in Common Agreement in the Madison County Probate Court. [Carter] Stockton was provided a copy of the construction mortgages executed by the CKPD Tenancy as borrower, which was defined as a tenancy in common comprised of CKPD and Samples Properties to Heritage Bank.
 "Shortly after execution of the Ground Lease, CKPD began the construction of an office building located on tracts one and two of the Leased Land (the `Building'). The Building was completed in or around August 2000. The Ground Lease specifically provided that `[t]itle to the Improvements shall remain in [CKPD], its successors and/or assigns, until termination of [the Ground Lease], at which time title shall revert to [the Stockton family].'
 "On August 29, 2000, the City of Huntsville issued a Certificate of Occupancy for the Building. The Certificate of Occupancy memorialized the Building's compliance with all city laws, ordinances, orders, rules, regulations and requirements (defined in the Ground Lease as `Legal Requirements' and retained herein) in effect on the date of the Certificate's issuance. On July 9, 2002, an appraisal was completed and/or issued in relation to the Leased Land and Building (the `Appraisal') by Clayton R. Jones, a professional, independent appraiser certified by the State of Alabama. Jones opined that: (1) the market value of the subject property (i.e., the Leased Land and the Improvements) was Two Million, One Hundred Thousand Dollars ($2,100,000); and that (2) the 35,300 square feet of Leased Land alone had a value of $26 per square foot, for a total market value of Nine Hundred Eighteen Thousand Dollars ($918,000).
 "On November 22, 2000 the Wiginton plaintiffs filed an action against the Stockton defendants and the CKPD defendants. The CKPD Defendants and Wiginton resolved the issues between them through a pro tanto settlement agreement on or about August 27, 2003.
 "On or about October 15, 2003, CKPD refinanced the mortgage on the Building for the principal sum of One Million, Five Hundred Seventy-Five Thousand Dollars. Pursuant to this refinance, CKPD signed a promissory note and the individual members of CKPD executed continuing guarantees. One of these guarantees was executed by Martz,[3] the new member of CKPD. In addition, CKPD paid a large amount of closing fees (approximately Twenty Thousand Dollars ($20,000)) in conjunction with the refinance.
 "On March 16, 2004, [Carter] Stockton sent a demand letter to CKPD claiming that: (1) the Partial Assignment constitutes `non-monetary default' under the Ground Lease; (2) CKPD's allegedly `late' payment of four monthly rent amounts resulted in `monetary default' *Page 1073 
of the Ground Lease; and (3) [the] Stockton[s were] due indemnity from the CKPD Defendants. Specifically, [Carter] Stockton complained through the March 16, 2004, correspondence of late rent in the months of (1) December 2000; (2) March 2001; (3) September 2001; and (4) February 2003. [Carter] Stockton previously sent a letter to CKPD waiving an allegedly late payment for December. Through the March 16, 2004, correspondence, [Carter] Stockton also alleged for the first time that CKPD was in default under Sections 4.01, 5.01 and 5.02 of the Ground Lease and thus, owed [the] Stockton[s] indemnification for legal fees. In response to [Carter] Stockton's March 16, 2004, correspondence, legal counsel for CKPD addressed the alleged `defaults' through a letter to [the] Stockton[s'] counsel, indicating that the allegedly late amounts were in escrow and requested proof of legal expenses incurred.
 "On April 15, 2004, the Stockton defendants filed their Counterclaim/Cross Claim against the Wiginton Plaintiffs and the CKPD Defendants. Through the Counterclaim/Cross Claim, [the] Stockton[s] also asserted for the first time that by constructing the Building across existing lot lines, the CKPD Defendants breached the Ground Lease by failing to `compl[y] with all rules, regulations and other requirements of the City of Huntsville.' Hulan Smith, the director of the City of Huntsville Building Department, testified that he currently has no knowledge of any problems with the Building's compliance with all appropriate ordinances and legal requirements of the City of Huntsville. Neither the City of Huntsville nor any other federal, state or municipal governmental or regulatory body has ever issued a notice or citation alleging that the Building did not comply with all Legal Requirements, or otherwise order CKPD to correct, modify or alter the Building.
 "At three separate times, [Carter] Stockton has requested that CKPD execute `clarifications' attempting to get an agreement as to the sequencing of the option to purchase as to the three tracts within the Ground Lease because he thought the Ground Lease was `somewhat ambiguous,' `misleading,' and that it `could be construed as ambiguous.' None of the clarifications sought by [Carter] Stockton were ever signed."
In its January 13, 2005, order, the trial court summarized the Stocktons' cross-claims against CKPD as seeking "to obtain a two-part declaration . . . stating that (1) CKPD is in default under various provisions of the Ground Lease; and (2) as a result of this alleged default, CKPD is precluded from exercising options granted to it under the Ground Lease." The trial court determined that the Stocktons had failed to present substantial evidence in support of their cross-claims against the CKPD defendants. This opinion addresses the trial court's determinations with regard to those cross-claims as each issue raised by the Stocktons is addressed and analyzed.
The parties first disagree as to how the appropriate standard of review should be applied. A motion for a summary judgment is properly granted where no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56, Ala. R. Civ. P.; Bussey v. John DeereCo., 531 So.2d 860 (Ala. 1988). "When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present `substantial evidence' creating a genuine issue of material fact." Exparte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 184
(Ala. 1999) (citing Bass *Page 1074 v. SouthTrust Bank of Baldwin County, 538 So.2d 794,797-98 (Ala. 1989)). "Substantial evidence" is "evidence of such a weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life AssuranceCo. of Florida, 547 So.2d 870, 871 (Ala. 1989). In reviewing a summary judgment, this court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts concerning the existence of a genuine issue of material fact against the movant. Hanners v. BalfourGuthrie, Inc., 564 So.2d 412 (Ala. 1990).
In this case, the Stocktons and the CKPD defendants each filed a motion for a summary judgment on the Stocktons' cross-claims against the CKPD defendants. Thus, both the Stocktons and the CKPD defendants are movants and nonmovants. They have each maintained that the evidence should be viewed in their favor and that any reasonable doubts be resolved against the other party. We reiterate that the pertinent question in considering and reviewing a motion for a summary judgment is whether there exists a genuine issue of material fact. Rule 56, Ala. R. Civ. P.; Bussey v. John Deere Co., supra. In considering that question, we will review a ruling that determines the merits of both a motion for a summary judgment and a cross-motion for a summary judgment in a light most favorable to the party who did not prevail under that ruling — in this case, the Stocktons. We note, however, that the Stocktons are required to demonstrate, through the presentation of substantial evidence, that there exists a genuine issue of material fact with regard to each of their claims.
 Alleged Violation of City Ordinances
The ground lease requires that CKPD comply with all municipal or state rules, ordinances, or laws. The Stocktons argue that the trial court erred in entering a summary judgment on that part of their claim in which they sought to have CKPD declared in default of the ground lease because CKPD allegedly violated certain legal requirements of the City of Huntsville ("the City"). Specifically, the Stocktons alleged that CKPD violated local building codes by erecting its building across the property lines ("the lot lines") of at least two of the three tracts of leased land.[4] With regard to this claim, the trial court determined, among other things, that the ground lease did not prohibit CKPD from building across the lot lines for the tracts of land.
The Stocktons maintain that CKPD violated "ordinances and restrictions," that CKPD did not comply with "legal requirements" of the City, and that CKPD failed to "obtain the proper permit." The only evidence to which the Stocktons refer this court in arguing that the ground lease prohibited CKPD from erecting a building across lot lines is the deposition testimony of Hulan Smith, a building inspector for the City. Smith repeatedly testified that the opinions he expressed were based upon an interpretation of the City's building code but not its zoning ordinances. *Page 1075 
Smith's testimony establishes that on August 29, 2000, the City issued a building permit for the building ultimately erected by CKPD. Smith testified that the City issued the building permit on August 29, 2000, and that, assuming that there had been no significant changes to the building since its construction, the building would still comply with the building code that was in effect at the time the building permit was issued.
Smith testified that, under the building code, erecting the building (and, apparently, the parking lot for the building) across the lot lines had the effect of "mak[ing] the three lots become one." Smith explained that "you cannot have one building on two separate lots. You would have to have other building code requirements." The Stocktons rely on the foregoing sentence in asserting that Smith's testimony establishes that the building erected by CKPD violates the City's "legal requirements."
However, in making their argument, the Stocktons ignore much of the remainder of Smith's testimony in which he explained that the City's building code was designed to protect the health and safety of the public and that the City, in enforcing the building code, did not concern itself with issues such as the ownership of the property or the maintenance of the lot lines between tracts of property. Smith testified that, under the building code, a person or an entity could erect a building across more than one lot line. Smith explained that the City "did not care whether they put it on one lot, two lots, or three lots, but when they put that building on it then it became one lot."
The Stocktons questioned Smith about the necessity of a "four-hour fire wall" being placed in the building on the lot lines, and Smith answered that a fire wall was not necessary in this case simply because the building crossed lot lines. Smith explained that a fire wall would, in essence, create two separate buildings. Smith clarified that a fire wall would be necessary if the owners of separate parcels of property insisted on maintaining the parcels of property as separate tracts. In its judgment, the trial court concluded that the ground lease did not require that the lot lines between the three tracts of property be maintained or that those lot lines could not be crossed by the construction of the building CKPD erected on the leased property. The Stocktons argue that the trial court erred in interpreting the ground lease in that manner. However, this court has examined the ground lease and can find no error in the trial court's interpretation with regard to this claim. In fact, the ground lease specifically states that the parties were entering into that agreement for the primary purpose of "the development and construction of an office building" on the "Leased Land."
The Stocktons also argue that, in the future, CKPD would not be able to return the leased property to the Stocktons in a condition that complied with the applicable building code. The Stocktons maintain that the ground lease requires CKPD to return "the leased land consisting of three separate lots" to the Stocktons. The Stocktons cite the following provision of the ground lease:
 "12.01. On the expiration of this Lease . . . or the termination of [CKPD's] possession under this Lease . . . or any entry of possession of the Leased Land and Improvements by [the Stocktons] . . ., [CKPD] shall promptly quit and surrender the Leased Land and Improvements, and deliver to [the Stocktons] actual possession and ownership of the Leased Land and Improvements in good order, condition, and repair." *Page 1076 
"`"Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning."'" Young v. Pimperl,882 So.2d 828, 831 (Ala. 2003) (citations omitted). Applying the foregoing principles to our interpretation of the ground lease (the contract at issue in this action), we must reject the Stocktons' interpretation of the ground lease with regard to this claim. The above-quoted section of the ground lease, even when read together with other portions of the ground lease, does not require that CKPD return the property to the Stocktons in a manner that preserves the lot lines between the tracts of land. The language of the ground lease is clear and does not support the interpretation the Stocktons advance.
Further, we agree with the trial court's determination that it did not have the power to issue a declaratory ruling on a possible future event. State Farm Mut. Auto. Ins. Co. v.Brown, 894 So.2d 643, 649 (Ala. 2004) ("A controversy is justiciable when present legal rights are affected, not when a controversy is merely anticipated. . . . Nor does the declaratory-judgment statute empower a court to give an advisory opinion."). In order for a court to grant declaratory relief,
 "it must have before it a bona fide, presently existing justiciable controversy that affects the legal rights or obligations of the parties. See King v. Calhoun Community College, 742 So.2d 795, 797 (Ala.Civ.App. 1999); see also State ex rel. Baxley v. Johnson, 293 Ala. 69, 73, 300 So.2d 106, 110 (1974) ('There must be a bona fide existing controversy of a justiciable character to confer upon the court jurisdiction to grant declaratory relief under the declaratory judgment statutes, and if there was no justiciable controversy existing when the suit was commenced the trial court had no jurisdiction.'). `Unless the trial court has before it a justiciable controversy, it lacks subject matter jurisdiction and any judgment entered by it is void ab initio.' Ex parte State ex rel. James, 711 So.2d 952, 960 n. 2 (Ala. 1998) (citing Stamps v. Jefferson County Bd. of Educ., 642 So.2d 941, 945 (Ala. 1994); Luken v. BancBoston Mortg. Corp., 580 So.2d 578
(Ala. 1991); Wallace v. Burleson, 361 So.2d 554, 555-56 (Ala. 1978)).
 "This Court has held that a declaratory-judgment action will not lie for an anticipated or future controversy. See Luken v. BancBoston Mortg. Corp., supra, 580 So.2d at 580; Graddick v. McPhillips, 448 So.2d 333, 336
(Ala. 1984)."
Hunt Transition Inaugural Fund, Inc. v.Grenier, 782 So.2d 270, 272-73 (Ala. 2000). At this point, the Stocktons can only speculate about the condition of the property and about whether the improvements currently on the property will remain in existence at the end of the term of the ground lease. Their argument pertaining to their anticipation of the condition of the property at the end of the term of the ground lease does not affect "present legal rights." StateFarm Mut. Auto. Ins. Co. v. Brown, 894 So.2d at 649. Therefore, any claim pertaining to whether the property might, at some time in the future, be returned to them in a condition that violates the City's building code is not a "presently existing justiciable controversy." Grenier,782 So.2d at 272. The Stocktons have failed to demonstrate error with regard to this issue.
We also reject the Stocktons' argument that the "combination" of the leased land into one tract defeats the rights of *Page 1077 
"the holder of the right of first refusal" in one of the tracts of property. The Stocktons lack standing to assert that argument on behalf of Danny Wiginton (who holds the right of first refusal), especially given that Wiginton has taken part in this litigation and is, therefore, capable of asserting those rights and arguments on his own behalf. Ex parteIzundu, 568 So.2d 771, 772 (Ala. 1990) ("As a general rule, `a litigant may not claim standing to assert the rights of a third party.'").
The Stocktons have failed to demonstrate that in constructing the building across lot lines, CKPD violated City ordinances or regulations. Therefore, we must conclude that the Stocktons have failed to demonstrate that there is a genuine issue of material fact regarding whether CKPD breached the ground lease by violating any applicable legal requirements imposed by the City or another governmental authority. We affirm the trial court's summary judgment in favor of CKPD on this claim.
 Waste
The Stocktons next argue, without citing to any supporting authority, that the trial court erred in entering a summary judgment on their claim that the CKPD defendants breached the ground lease by committing waste. In their brief on appeal, the Stocktons have not argued to this court the basis for their theory that the CKPD defendants have committed waste. Our supreme court has stated:
 "Compliance with Rule 28[, Ala. R.App. P.,] is not optional. In McLemore v. Fleming, 604 So.2d 353, 353 (Ala. 1992), this Court observed:
 "`In Gibson v. Nix, 460 So.2d 1346, 1347
(Ala.Civ.App. 1984), the court stated: "Where an appellant fails to cite any authority, we may affirm, for it is neither our duty nor [our] function to perform all of the legal research for an appellant." See Henderson v. Alabama A M University, 483 So.2d 392 (Ala. 1986) (quoting Gibson with approval).
 "`Furthermore, we cannot, based on undelineated propositions, create legal arguments for the appellant. Spradlin v. City of Birmingham, 601 So.2d 76 (Ala. 1992).'
 "See also Connerly v. Connerly, 523 So.2d 461 (Ala.Civ.App. 1988) (an appellant's citations to general propositions of law not specifically applicable to the issues presented by the appeal do not meet the requirements of Rule 28, Ala. R.App. P.)."
BankAmerica Housing Servs., a Div. of Bank of America,FSB v. Lee, 833 So.2d 609, 620-21 (Ala. 2002) (emphasis added). Further, it is not the function of this court to perform the appellant's legal research. McLemore v.Fleming, 604 So.2d 353 (Ala. 1992). We affirm as to this issue.
 Alleged Monetary Breach of the Ground Lease Due to theFailure to Pay Late-fee Penalties
In a March 16, 2004, letter to the CKPD defendants, and later in their August 25, 2004, amended cross-claim, the Stocktons claimed that CKPD had made late rental payments for the months of December 2000, March 2001, September 2001, and February 2003. According to the Stocktons, CKPD had failed to pay the late-fee penalty in connection with those four late payments; the Stocktons claimed that CKPD owed $1,300 in late-fee penalties[5] for those alleged late payments. In response to the March 16, 2004, letter, CKPD notified the Stocktons that while it disputed its liability for those late-fee penalties, *Page 1078 
it had placed the $1,300 in escrow until such time as the Stocktons could present evidence demonstrating that the payments were in fact untimely made.
The CKPD defendants dispute that there has been a breach of the ground lease on the basis of CKPD's alleged failure to make four timely rental payments. The CKPD defendants point out that although the December 2000 rental payment was late, the Stocktons waived the late-fee penalty for that payment; thus, the Stocktons could claim, at most, $975 in late-fee penalties for the three remaining allegedly late rental payments. The CKPD defendants maintain that there is no evidence in the record indicating that those payments were, in fact, late; they point out that the Stocktons did not present evidence regarding when the Stocktons received the other three purportedly late rental payments.
Even assuming, however, that the record did contain evidence indicating that the three payments were, in fact, untimely made, we note that the trial court resolved this issue on another basis. In reaching its judgment, the trial court determined that any purported breach of the ground lease on the basis of the failure to pay late-fee penalties was not a material breach of the ground lease. The elements that must be proven in a breach-of-contract action include the existence of a contract, a material breach of that contract by one party, and damage to the other party as a result of the breach. Sokolv. Bruno's, Inc., 527 So.2d 1245, 1247-48 (Ala. 1988). "A material breach [of a contract] is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract." Id. at 1248.
At the time the Stocktons first asserted their claim to the late-fee penalties, the ground lease had been in effect for more than four years and this litigation had been pending for almost four years. At that time, CKPD had paid approximately $300,000 in rental payments pursuant to the ground lease. Thus, the amount the Stocktons claimed was owed to them in late-fee penalties amounted to less than one percent of the rental payments to the date the claim was asserted.
Assuming that the Stocktons had actually presented evidence that the payments were late, the Stocktons argue that whether the purported breach was a material breach of the ground lease is a question of fact. However, the Stocktons have failed to argue or demonstrate that the alleged failure to pay the late-fee penalties was a breach "that touche[d] the fundamental purposes of the contract and defeat[ed] the object of the parties in making the contract." See Sokol v. Bruno's,Inc., 527 So.2d at 1248. Therefore, we cannot agree that the Stocktons presented evidence to create a question of fact regarding whether the purported breach of the ground lease was, in fact, material. Given the evidence in the record, we affirm the trial court's determination that, as a matter of law, the alleged breach of the late-fee provisions of the ground lease was not a material breach that would support a cause of action for breach of contract.
 Guaranty Claims
The Stocktons next argue that the trial court erred in entering a summary judgment in favor of defendants Jackson, Graffeo, and Michael Samples (hereinafter together referred to as "the guaranty defendants"). In making their argument on this issue, the Stocktons do not set forth any law pertaining to the enforcement of a guaranty contract. Rather, they merely cite general propositions of law pertaining to the standard of review for a summary judgment. Citations to general authority do not meet the requirements of Rule 28, *Page 1079 
Ala. R.App. P. Connerly v. Connerly, 523 So.2d 461
(Ala.Civ.App. 1988).
Out of an abundance of caution, we note that in reaching its judgment, the trial court discussed the law pertaining to the enforcement of guaranty contracts and cited EquileaseCorp. v. McKinney, 52 Ala.App. 109, 289 So.2d 809 (1974) (an appellant must establish the existence of a guaranty contract, the breach of the contract by the third-party lessee, notice of the breach to the defendant, and nonpayment by the defendant). The trial court determined that the Stocktons had failed to demonstrate the existence of a valid, enforceable guaranty contract.
The ground lease contains a provision requiring the guaranty defendants to "guarantee the prompt performance" of the ground lease until the improvements on the property have a value of $1,000,000. The guaranty defendants presented evidence indicating that the value of the improvements on the leased property exceeded $1,000,000. In response, the Stocktons presented evidence indicating that the value of the improvements was "likely to be less than $1,000,000" if CKPD was required to make structural changes to the building in order to bring it into what the Stocktons deem to be compliance with the City's "legal requirements."[6]
As already noted, however, we have rejected the Stocktons' argument that the building violated the City's codes and regulations. Further, the Stocktons' expert's opinion of what the value of the leased property is "likely to be" if the City were to reverse its current position and determine that the building did not, in fact, comply with the City's building code is a matter of speculation and conjecture. Thus, the Stocktons' evidence with regard to this issue was dependent on the possibility of a future event and was, therefore, speculative at best. That evidence was not sufficient to create a genuine issue of material fact. See Blackburn v. State Farm Auto. Ins.Co., 652 So.2d 1140, 1142 (Ala. 1994) ("bare argument or conjecture does not satisfy the nonmoving party's burden to offer substantial evidence to defeat the [summary-judgment] motion"). Given the foregoing, we cannot say that the Stocktons have demonstrated that the trial court erred in entering a summary judgment on their claim seeking the enforcement of a guaranty contract.
 CKPD's Alleged Failure to Honor the Right of First Refusal
In their amended cross-claim, the Stocktons claimed, among other things, that CKPD breached the ground lease by transferring a part of CKPD's interest in the building to Samples Properties without first offering the interest to the Stocktons pursuant to the terms of a first right of refusal contained in the ground lease. In ruling on that claim, the trial court determined that this claim was defeated by a portion of the ground lease that allowed *Page 1080 
CKPD to assign any portion of the ground lease without notice to the Stocktons.
The evidence pertinent to this issue indicates that CKPD agreed to transfer to Samples Properties a 25% interest "in the ground lease." That agreement was formalized in a document entitled "Partial Assignment of Ground Lease" (hereinafter "the partial-assignment agreement"). The partial-assignment agreement defines the three tracts as the "leased land," and it defines the leased land together with the improvements to be constructed as "the Property." The partial-assignment agreement seems to use the terms "the Property" and "the Ground Lease" interchangeably in setting forth the terms of that agreement.
In addition, CKPD and Samples Properties entered into an agreement ("the tenancy-in-common agreement") in which they formed the CKPD Tenancy in Common. The tenancy-in-common agreement refers to the parties to that agreement as "owners of fractional undivided interests in and to that certain Ground Lease Agreement . . ., together with certain improvements thereon. . . ." Also, a December 2000 construction mortgage was executed by the "CKPD Tenancy in Common, a tenancy in common comprised of CKPD Development, Co., LLC, . . . and Samples Properties, Inc. . . ."; that mortgage specifically stated that it was for "the construction of an improvement on land."
In reaching its judgment on the issue whether CKPD's transfer of an interest in the improvements to Samples Properties constituted a breach of the ground lease, the trial court relied on § 13.01 of the ground lease. That section of the ground lease provides that "[t]his Lease and the Term and estate granted by this Lease, or any part of this Lease or that Term and estate, may be subleased or assigned, without [the Stocktons'] written consent."
By its terms, however, the ground lease encompasses only the land that is leased and not the improvements thereon. In support of this conclusion, we note that article 18 of the ground lease governs a right of first refusal pertaining to the improvements on the leased land. Section 18.02 of the ground lease provides:
 "In the event [CKPD] shall offer the Improvements or its interest in the Improvements for sale during the term of this Lease, then, it shall first offer the Improvements to [the Stocktons] by notifying [the Stocktons] in writing of the price and terms offered by a third party. . . ."
The CKPD defendants assert that the creation of the CKPD Tenancy in Common constituted a permissible assignment of an interest in the ground lease and that it did not constitute a sale of CKPD's interest in the improvements that would trigger the right of first refusal contained in section 18.02 of the ground lease. The Stocktons equate the creation of the CKPD Tenancy in Common to a sale of CKPD's interest in the improvements on the leased land that would trigger the right of first refusal. A basic rule of contract interpretation is that the courts must interpret the sections of a contract in a manner that gives effect to each. See Smith v. KennesawLife Ace. Ins. Co., 284 Ala. 12, 18, 221 So.2d 372,377 (1969) ("`It is our task to give effect to all parts of the contract and to give a reasonable interpretation to all of its provisions.'" (quoting Metropolitan Life Ins. Co. v.Korneghy, 37 Ala.App. 497, 502, 71 So.2d 292, 296
(1954))). In this case, the ground lease allows an assignment of the ground lease, but it prohibits a "sale" of an interest in the improvements on the leased property unless the interest is first offered to the Stocktons. After careful consideration, we conclude that there is a material *Page 1081 
factual question regarding whether CKPD's transfer of a 25% interest in the building to Samples Properties constituted a sale that would trigger the right of first refusal contained in the ground lease. Therefore, we hold that the trial court erred in entering a summary judgment based on the evidence presented to it as this stage of the proceedings.
 Suppression Claims
The Stocktons next argue that the trial court erred in entering a summary judgment in favor of the CKPD defendants on the Stocktons' claims of suppression. "The elements of a claim of fraudulent suppression are generally stated as (1) a duty to disclose the facts, (2) concealment or nondisclosure of material facts by the defendant, (3) inducement of the plaintiff to act, and (4) action by the plaintiff to his injury." Carter v. Chrysler Corp., 743 So.2d 456, 4(30 (Ala.Civ.App. 1998) (citing Wilson v. Brown,496 So.2d 756, 759 (Ala. 1986)).
One of the Stocktons' suppression claims related to CKPD's transfer of the 25% interest in the building or improvements to Samples Properties. The trial court determined in its summary judgment that that claim was barred by the applicable two-year statute of limitations. See §6-2-3, Ala. Code 1975.
Under § 6-2-3, a cause of action alleging fraud must be filed within two years of the discovery of the fraud. Our supreme court has held that "[f]raud is discovered when it ought to or should have been discovered; that is, `the time of discovery is the time at which the party actually discovered the fraud or had facts that, upon closer examination, would have led to the discovery of the fraud.'" Dickens v.SouthTrust Bank of Alabama, N.A., 570 So.2d 610, 612
(Ala. 1990) (quoting Lader v. Lowder Realty Better Homes Gardens, 512 So.2d 1331,1332 (Ala. 1987)).
In Tanner v. Church's Fried Chicken, Inc.,582 So.2d 449 (Ala. 1991), the plaintiffs asserted a claim of suppression based on their allegation that they were promised franchises of a certain duration, but that the actual franchise agreements did not provide for agreements of that duration. The trial court entered a summary judgment on the fraudulent-suppression claim based on its determination that the claim was barred by the two-year statute of limitations. Our supreme court affirmed, explaining:
 "The [trial] court noted that `even if the plaintiffs did not have actual knowledge of the contents of the franchise agreements, the information was available from sources which were readily accessible. . . . The evidence is clear that the plaintiffs had access to such information but did not act on it.' We agree. The law requires that a plaintiff exercise reasonable diligence in determining the facts of an alleged fraud. Batchelor v. Batchelor, 502 So.2d 751, 754 (Ala. 1987)."
Tanner v. Church's Fried Chicken, Inc.,582 So.2d at 453.
The Stocktons maintain that they did not see or receive a copy of the actual tenancy-in-common agreement until "sometime in 2004." Therefore, they claim, they did not learn of the transfer to Samples Properties, made pursuant to that agreement, of the 25% interest in the building. However, Carter Stockton concedes that he received a copy of the partial-assignment agreement in October 2000. Carter Stockton testified that he was not sure if he read the partial-assignment agreement when he received it. According to Carter Stockton, if the partial-assignment agreement transferred an interest in the improvements to Samples *Page 1082 
Properties, then the right of first refusal would have been triggered when that agreement was created.[7] As noted earlier in this opinion, the partial-assignment agreement refers to "certain improvements" on the leased property.
A "Notice of CKPD Tenancy in Common Agreement" was filed in the Madison County Probate Court on December 18, 2000. That notice defined CKPD and Samples Properties collectively as "owners," and stated that "[o]wners are the owners of fractional undivided interests in and to that certain ground lease Agreement . . . together with certain improvements thereon." Also in December 2000, Carter Stockton received from CKPD a copy of the construction mortgage executed by the "CKPD Tenancy in Common, a tenancy in common comprised of CKPD Development, Co., LLC, . . . and Samples Properties, Inc. . . ."; that mortgage specifically stated that it was for "the construction of an improvement on land."
Thus, the Stocktons had information from several sources that would tend to indicate that CKPD had transferred an interest in improvements on the leased property to Samples Properties. "[T]he limitations period [for a fraudulent-suppression claim] begins to run when a plaintiff becomes privy to facts that would provoke inquiry in the mind of a person of reasonable prudence and that (if followed up) would have led to the discovery of the fraud." Smith v.Evans, 829 So.2d 774, 776 (Ala.Civ.App. 2002) (citingAuto-Owners Ins. Co. v. Abston, 822 So.2d 1187, 1195
(Ala. 2001)) (emphasis omitted). The issue when a plaintiff should have discovered an alleged fraud can be decided as a matter of law where the plaintiff "knew of facts that would have put a reasonable person on notice" of the alleged fraud.Smith v. Evans, 829 So.2d at 778. In this case, we agree with the trial court that the evidence demonstrates that the Stocktons had knowledge of facts that, had they inquired, would have led to their discovery of the alleged fraud. Therefore, we cannot say that the Stocktons have demonstrated that the trial court erred in entering a summary judgment as to this suppression claim.
With regard to their other suppression claim, the Stocktons allege that before the CKPD defendants entered into the settlement agreement with the Wigintons, the CKPD defendants had a duty to notify the Stocktons of their intent to enter into that settlement agreement. A duty to disclose may arise from a confidential relationship between the parties or from the particular circumstances of the case. § 6-5-102, Ala. Code 1975. In determining whether a duty to disclose has arisen, the trial court must consider: "`(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs' opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.'" Armstrong Bus.Servs., Inc. v. AmSouth Bank, 817 So.2d 665, 677 (Ala. 2001) (quoting State Farm Fire Cas. Co. v. Owen,729 So.2d 834, 842-43 (Ala. 1998)).
In this case, it is undisputed that the ground lease does not impose on the CKPD defendants a duty to disclose. The trial court determined that there existed no special circumstances or special relationship between the Stocktons and the CKPD defendants that would give rise to a duty to disclose for the purposes of maintaining a cause of action for suppression. The Stocktons maintain that their shared status as codefendants in the action initiated *Page 1083 
by the Wigintons created in the CKPD defendants a duty to disclose to the Stocktons that they were considering altering their theory of the litigation. The Stocktons have not directed this court to any supporting authority in which a court has found a duty to disclose under circumstances similar to those in this case.
We cannot agree that merely sharing the status of codefendants and a common litigation strategy creates the type of confidential relationship from which arises a duty to disclose. To hold otherwise would expose any codefendant who wished to settle a claim asserted against it to being subject to a fraud claim asserted by another codefendant. Further, such a result would defeat the public-policy goal of encouraging parties to resolve their disputes amicably. See Large v.Hayes, 534 So.2d 1101, 1105 (Ala. 1988) ("It is the policy of the law to encourage the settlement of disputes.").
 Failure to Reimburse for Legal Fees Incurred
The Stocktons also argue that the trial court erred in entering a summary judgment in favor of the CKPD defendants on the Stocktons' claim seeking reimbursement for legal fees they claim to have expended in enforcing the terms of the ground lease. The Stocktons dispute several factual findings made by the trial court in reaching its decision on this issue. However, on appeal, the Stocktons do not challenge the trial court's legal determination that three provisions in the ground lease upon which the Stocktons relied in asserting their claim for attorney fees incurred in this litigation were inapplicable.[8] Therefore, we do not address those provisions.
Rather, the Stocktons rely on another provision, § 11.07 of the ground lease, in arguing that they were entitled to recover unreimbursed legal fees.[9] That section provides that "[CKPD] expressly agrees to pay all expenses that [the Stocktons] may incur for reasonable attorneys' fees . . . for enforcing the terms and provisions of this Lease. . . ." The Stocktons did not prevail in the trial court on their claims against the CKPD defendants in which they purportedly sought to enforce various provisions of the ground lease. Even assuming that they had prevailed on those claims and were entitled to an award of fees, as the trial court noted in its summary judgment, the Stocktons failed to present any evidence with regard to the value of those legal fees incurred or the reasonableness of those fees with regard to those claims.[10]
Therefore, given the foregoing, we cannot say that the trial court erred in entering a summary judgment with regard to the Stocktons' claim for an award of an attorney fee.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Crawley, P.J., and Pittman and Murdock, JJ., concur.
Bryan, J., concurs in the result, without opinion.
[1] A true postjudgment motion filed pursuant to Rule 59, Ala. R. Civ. P., may only be made in reference to a final order or judgment. Rule 59(e), Ala. R. Civ. P.; Ex parte Troutman Sanders, LLP, 866 So.2d 547,549 — 50 (Ala. 2003); see also Malone v. Gainey, 726 So.2d 725, 725 n. 2 (Ala.Civ.App. 1999). The January 13, 2005, order, because it did not resolve all the rights and claims of all of the parties, was not a final judgment. See Ex parte Harris, 506 So.2d 1003, 1004 (Ala.Civ.App. 1987) ("any order which adjudicates fewer than all the claims is not a final order which will support an appeal").
[2] In setting forth the facts of this case, the trial court placed the 54 sentences that makeup its factual findings and determinations into separate, numbered paragraphs. The trial court also supported each sentence with a citation or citations to the record. In quoting the trial court's order, we have omitted the numbered paragraphs and the citations to the record.
[3] This person was not named as a party to this action.
[4] The Stocktons contend only generally that CKPD violated some legal restrictions; they have not specifically identified any law, ordinance, or building code that they contend was violated by CKPD's construction of the building. The only evidence the Stocktons submitted with regard to this claim was the testimony of Hulan Smith, a building inspector for the City of Huntsville. Smith stated that he could only testify regarding whether he believed CKPD had violated the City's building code. Therefore, we interpret the Stocktons' argument with regard to this claim as asserting a violation of the applicable building code.
[5] The ground lease provides for the imposition of penalties for late rental payments.
[6] The Stocktons' expert testified as follows in his affidavit:
 "The value of the leased estate is $2,100,000. The value of the land as noted in [the CKPD defendants' expert's] appraisal and assumed to be correct for this analysis is $918,000; therefore, the contributing value of the improvements is $1,182,000 less the cost to cure to bring the improvements into compliance. Using $850,0000 as the estimated cost to cure, the current contributing value of the improvements must be $342,000 ($1,182,000 minus $850,000).
 "Based upon my review of all of the foregoing information and assuming the facts stated within are correct, I believe that in the event CKPD is forced to comply with the City of Huntsville's Building Inspection requirements then the value of the leased estate is likely to be less than $1,000,000."
[7] For the purposes of this opinion, we do not decide that issue.
[8] The trial court concluded that "[S]ection 4.01, Section 5.01, and Section 5.02 of the Ground Lease . . . do not give the Stockton[s] the right to claim any legal fees in this action."
[9] Contrary to a finding contained in the trial court's judgment, the Stocktons did mention this provision in their argument before that court with regard to this issue.
[10] In their brief on appeal, the Stocktons assert that they did present evidence of their attorney fees. However, they refer this court only to a March 26, 2004, letter from Carter Stockton, in his capacity as managing partner of the Stockton Family Limited Partnership, to Mark Jackson and Michael Samples in which Carter Stockton asserted the CKPD defendants owed the Stocktons certain amounts, including $11,419.81 for legal fees expended in defending the Wigintons' claims. *Page 1084