Steven Hawk sued Roger Watts Insurance Agency, Roger Watts, and Mary Watts (hereinafter together referred to as "the defendants") and sought an award of damages based on his claims alleging negligent or wanton failure to procure insurance; negligent or wanton hiring or failure to supervise; and various forms of fraud. The defendants answered and denied liability.
The defendants filed a motion for a summary judgment, which Hawk opposed. The deposition testimony of the individual parties and numerous documents were submitted to the trial court in support of the parties' positions with regard to the summary-judgment motion. On May 31, 2007, the trial court entered a summary judgment in favor of the defendants on all claims. Hawk timely appealed, and the case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala. Code 1975.
The record indicates that Roger Watts operates Roger Watts Insurance Agency ("the agency") and that Watts's wife, Mary Watts, works for the agency. The agency sells insurance primarily for Nationwide Mutual Fire Insurance Company ("Nationwide"), but also for other companies.
In June 2004, Hawk married; he and his wife each have teenaged or college-aged children from previous marriages. The record indicates that, at the times relevant to this dispute, all the Hawks' family vehicles were insured by Nationwide. In the summer or early fall of 2004, Hawk switched Nationwide agents to work with the agency with regard to the insurance coverage on the family's vehicles and home. Hawk explained that he began working with the agency at that time because his wife had worked with and was friends with Roger Watts.
Among the vehicles owned by the family in 2004 was Hawk's 1999 BMW 528i (hereinafter "the vehicle"). That vehicle is the subject of the dispute between the parties. Hawk had added to the vehicle certain equipment, and he had replaced parts or equipment on the vehicle with other parts or equipment more suited to the functioning of a racing vehicle. In this opinion, we refer to the additions and alterations Hawk made to the vehicle as "after-market modifications." Hawk stated that he did not race the vehicle and that he acquired the after-market modifications for aesthetic reasons. Hawk testified that he spent $12,000 on after-market modifications to the vehicle, but a document he submitted to the agency in applying for an insurance policy for the vehicle indicated that the total cost of those modifications was approximately $10,437.
According to Hawk, his wife, who previously had worked as an insurance agent, suggested that he contact the agency in the late fall of 2004 to obtain insurance coverage for the after-market *Page 586 
modifications he had made to the vehicle. Although some of the dates of the conversations between Hawk and the agency representatives are in dispute, the following is a summary of those conversations. Hawk testified that in the fall of 2004 he took a list of the after-market modifications he had made on the vehicle to the agency and that he discussed the desired insurance policy with Mary Watts. Hawk did not speak with Roger Watts concerning the insurance policy on the vehicle until early 2006. According to Hawk, he told Mary Watts that he wanted an insurance policy that would cover the depreciated value of his vehicle and that would reimburse him for the full, undepreciated cost of the after-market modifications in the event of either damage to or a total loss of the vehicle. Hawk testified that he asked Mary Watts if she anticipated a problem with his obtaining the type of insurance he wanted on the vehicle and that she responded "not at all." Hawk provided Mary Watts with documents supporting his cost estimates for the after-market modifications, and Mary Watts submitted those documents, along with appropriate application forms, to Nationwide.
Hawk testified that in early 2005, when he had not received a response regarding the desired insurance policy, he again contacted Mary Watts. Hawk stated that Mary Watts indicated to him that she would call Nationwide to inquire about the status of the policy. The record does not indicate the result of that telephone call.
In late March or early April 2005, Hawk received a policy dated March 25, 2005, that contained a list of policy declarations setting forth the types of coverage the insurance policy provided. The declarations in the March 25, 2005, policy did not list coverage for the after-market modifications. Therefore, Hawk went to the agency, and he and Mary Watts attempted to contact a Nationwide underwriter. The underwriter was unavailable at that time, so Mary Watts left a message for her. It does not appear, however, that Hawk had any further contact with Nationwide or the agency until later in April 2005. In April 2005, Hawk received another set of declaration pages, dated April 8, 2005. The April 8, 2005, declaration pages differed from those contained in the March 25, 2005, policy only in that the deductible for comprehensive coverage on the vehicle was changed from $100 to $500.
Hawk received a third set of declaration pages for the insurance policy on the vehicle; those pages were dated May 26, 2005. The May 26, 2005, declaration pages contained a notation indicating an "added optional equipment charge" with regard to the vehicle. The list of declarations regarding coverage for the vehicle were the same as those listed in the March 25, 2005, declaration pages and the April 8, 2005, declaration pages, but the cost of some of the coverages rose and increased Hawk's overall insurance cost for the vehicle by approximately $43 every six months. The May 26, 2005, declaration pages read in pertinent part:
"IMPORTANT MESSAGES:
THE FOLLOWING CHANGE(S) HAVE BEEN MADE TO YOUR POLICY:
EFFECTIVE MAY 24, 2005
1999 BMW 528i
ADDED OPTIONAL EQUIPMENT CHARGE
"SEE ENCLOSED NOTICE FOR PREMIUM DETAIL
". . . . *Page 587 
"2. 1999 BMW 528i ID #. . .
"Coverages Limits of Liability Six Month Premium
"COMPREHENSIVE ACTUAL CASH VALUE LESS $500 $ 51.00
"COLLISION ACTUAL CASH VALUE LESS $500 $185.60
"PROPERTY DAMAGE LIABILITY $100,000 EACH OCCURRENCE $ 60.70
"BODILY INJURY LIABILITY $100,000 EACH PERSON $ 9.80
 $300,000 EACH OCCURRENCE $ 14.60
"MEDICAL PAYMENTS $2,000 EACH PERSON
"UNINSURED MOTORISTS BODILY INJURY $50,000 EACH PERSON $ 45.70
 $100,000 EACH ACCIDENT
"TOWING AND LABOR $50 EACH DISABLEMENT $ 1.40
 "TOTAL $428.80
"VEHICLE ENDORSEMENTS 3144
"LEASEHOLDER- BMW FINANCIAL SVCS"

Hawk testified that after he received the May 26, 2005, declaration pages quoted above, he believed that he had obtained the coverage he had requested. Therefore, according to Hawk, he called Mary Watts to thank her; Hawk also stated that during the course of that conversation, he inquired about the coverage referenced in the declarations pages. Hawk explained:
 "I called her up, and I told her I was a little bit foggy on what the . . . what the optional additional equipment was. I said does this mirror what you and I talked about back in October and she said yes. I said let me just be clear with you. This is going to cover replacement parts for a small fender bender and this is going to cover me for a total loss, plus the twelve thousand dollars in modifications, and she said yes."
It is undisputed that at the time of that conversation Mary Watts had informed Hawk that she did not have a copy of the May 26, 2005, declaration pages in front of her and that she was relying on information about those pages orally provided to her by Hawk.
In July 2005, Hawk received additional policy declaration pages that were identical to the May 26, 2005, declaration pages with regard to the coverage listed for the vehicle. He again received a policy declaration regarding the vehicle in September 2005, and the declarations for the vehicle remained the same. The insurance premiums regarding the vehicle had increased at the time of the September 2005 insurance statement, but it appears from the record to be undisputed that the addition of a teenaged driver on the policy accounted for that premium increase.
During his deposition in this matter, Hawk testified that he had not read the insurance policy on the vehicle. In fact, Hawk testified that he had never read an automobile insurance policy.
In November 2005, Hawk was driving the vehicle in Ohio when he was involved in an automobile accident in which the other driver was at fault. That accident resulted in the total loss of the vehicle. Shortly thereafter, Hawk discovered that the insurance policy on the vehicle did not *Page 588 
provide the coverage for which he believed he had contracted. Hawk learned that the insurance policy on the vehicle provided coverage in the event of an accident that did not result in the total loss of the vehicle; in such a case, the insurance policy provided that the after-market modifications would be repaired or replaced with the same brand parts as Hawk had used in the after-market modifications. However, in the event of a total loss of the vehicle, the insurance policy did not provide the coverage Hawk desired, i.e., reimbursement for the $10,000 or $12,000 original cost of the after-market modifications.
The value of the vehicle exceeded the $7,500 in coverage provided by the insurance policy of the driver at fault in the automobile accident. Therefore, Nationwide, which was then subrogated to Hawk's claim against the other driver, paid Hawk for the value of the vehicle. Although it initially offered Hawk $10,400, Nationwide ultimately paid Hawk $12,800 for his claim under the insurance policy covering the vehicle. Hawk insists that that payment did not include any of the value added to the vehicle by the after-market modifications. Hawk has maintained in this litigation that under the policy he believed he had purchased, he would have recovered the $12,800 value of the vehicle plus an additional $10,000 to $12,000, representing the cost to him of the after-market modifications.
Roger Watts testified that Nationwide does not offer the type of insurance that Hawk desired for the type of vehicle Hawk owns; Watts referred to that coverage as a "stated value" policy under which the stated value of the vehicle is recoverable.[1] Watts also stated that he is not aware of many other insurance company that would replace the cost of after-market modifications in addition to providing coverage for the value of the vehicle itself. Watts testified that customizations or after-market modifications are not covered according to their cost because often an original piece of equipment is replaced (and its value taken from the vehicle) in the process of modifying the vehicle.
On appeal, Hawk addresses the trial court's entry of a summary judgment in favor of the defendants on his fraud claims and his failure-to-procure-insurance claims. Hawk has asserted no arguments on appeal with regard to his claims of negligent or wanton hiring or failure to supervise, and, accordingly, those issues are deemed waived. Pardue v. Potter,632 So.2d 470, 473 (Ala. 1994) ("Issues not argued in the appellant's brief are waived.").
 "A motion for a summary judgment is properly granted where no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56, Ala. R. Civ. P.; Bussey v. John Deere Co., 531 So.2d 860 (Ala. 1988). `When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present "substantial evidence" creating a genuine issue of material fact.' Ex parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 184 (Ala. 1999) (citing Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989)). `Substantial evidence' is `evidence of such a weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, *Page 589 
871 (Ala. 1989). In reviewing a summary judgment, this court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts concerning the existence of a genuine issue of material fact against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala. 1990)."
Stockton v. CKPD Dev. Co., 936 So.2d 1065, 1073-74
(Ala.Civ.App. 2005).
Hawk first argues that the trial court erred in entering a summary judgment on his misrepresentation and suppression claims. In support of his argument, Hawk cites only general caselaw setting forth the essential elements of claims alleging misrepresentation and suppression. For example, Hawk points out that in order to prevail on a claim alleging misrepresentation, a plaintiff must establish "(1) [the existence] of a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance." Harrington v.Johnson-Rast Hays Co., 577 So.2d 437, 439
(Ala. 1991). Also, with regard to a claim alleging suppression, a plaintiff must present evidence of "`(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury.'" Freightliner, L.L.C. v. WhatleyContract Carriers, L.L.C., 932 So.2d 883, 891 (Ala. 2005) (quoting Lambert v. Mail Handlers Benefit Plan,682 So.2d 61, 63 (Ala. 1996)).
Hawk argues that a fact issue exists that precludes the entry of a summary judgment because he and Mary Watts gave conflicting testimony regarding the conversation in which he requested insurance coverage. Hawk points to his testimony in which he stated that Mary Watts told him that she could and would obtain the insurance coverage he requested, which conflicts with Mary Watts's testimony denying that he requested such insurance coverage. Hawk argues that that factual issue is sufficient to defeat the summary-judgment motion on his fraud claims.
In their brief on appeal, the defendants respond by asserting that Hawk was required to present substantial evidence in support of each element of his fraud claims; the defendants contend that Hawk failed to do so. Specifically, the defendants argue that Hawk failed to establish that he reasonably relied on Mary Watts's purported statements. Reliance is an element required in misrepresentation and suppression claims. Drummond Co. v. Walter Indus.,Inc., 962 So.2d 753, 783 (Ala. 2006); Alabama Elec.Coop., Inc. v. Bailey's Constr. Co., 950 So.2d 280, 285-86
(Ala. 2006); Freightliner, L.L.C. v. Whatley ContractCarriers, L.L.C., supra; and Harrington v.Johnson-Rast Hays Co., supra. Under ForemostInsurance Co. v. Parham, 693 So.2d 409 (Ala. 1997), a party alleging any form of fraud must present evidence of "reasonable reliance" on the purported fraud.
In arguing that Hawk could not have reasonably relied on Mary Watts's representations, the defendants primarily point to the declaration pages of the various policies Hawk received. The defendants contend that those declaration pages do not set forth the type of insurance that Hawk maintains he was led to believe he had acquired. The defendants maintain that Hawk presented no evidence indicating that, given the declaration pages, he had reasonably relied on any representations made by Mary Watts. See Foremost Ins. Co. v. Parham,693 So.2d at 421 (holding that a party could not maintain a fraud action under the reasonable-reliance standard when the party was "fully capable of reading and understanding [his] documents *Page 590 
but nonetheless made a deliberate decision to ignore written contract terms"). As they did before the trial court, the defendants cite a number of cases to this court that they contend support their argument on this issue. See, e.g.,Liberty Nat'l Life Ins. Co. v. Ingram, 887 So.2d 222, 229
(Ala. 2004) (holding that because the plaintiff was capable of reading the insurance policies, he did not reasonably rely on the agent's representations that conflicted with the terms of the policy); and Cherokee Farms, Inc. v. Fireman's FundIns. Co., 526 So.2d 871, 877 (Ala. 1988) ("`it is unreasonable to rely on oral statements when one is in possession of written documents that would put one on notice as to the validity of oral statements'" (quoting WoodlawnFraternal Lodge No. 525, F. AM. v. Commercial Union Ins.Co., 510 So.2d 162, 164 (Ala. 1987))).
In his brief on appeal, Hawk merely asserts that the defendants erroneously contend that he did not reasonably rely on Mary Watts's representations. Hawk fails to cite any supporting authority with regard to the element of reliance, and he fails to attempt to distinguish the cases upon which the defendants relied in successfully moving for a summary judgment before the trial court. It is not the function of this court to conduct research or to search the record on behalf of an appellant in an effort to reverse a trial court's judgment. Spradlin v.Birmingham Airport Auth., 613 So.2d 347, 348 (Ala. 1993); and Lockett v. A.L. Sandlin Lumber Co., 588 So.2d 889,890 (Ala.Civ.App. 1991). The arguments in Hawk's brief on appeal have failed to demonstrate to this court that the trial court erred in entering a summary judgment in favor of the defendants on Hawk's fraud claims. Therefore, that part of the summary judgment that is related to Hawk's fraud claims is due to be affirmed.
Hawk also argues that the trial court erred in entering a summary judgment in favor of the defendants on his claims alleging negligent failure to procure insurance.[2] "`[W]hen an insurance agent or broker, with a view to compensation, undertakes to procure insurance for a client, and unjustifiably or negligently fails to do so, he becomes liable for any damage resulting therefrom.'" Crump v. Geer Bros.,336 So.2d 1091, 1093 (Ala. 1976) (quoting Timmerman Ins. Agency, Inc.v. Miller, 285 Ala. 82, 85, 229 So.2d 475, 477 (1969)). With regard to this issue, the defendants point out that there is no evidence in the record indicating that the type of insurance Hawk insists he requested, i.e., insurance for the value of the vehicle plus reimbursement for the cost of the after-market modifications, was actually available from any insurance provider; the evidence does indicate that such insurance coverage was not available through Nationwide. The defendants cite supporting authority from other jurisdictions and argue, as they did before the trial court, that a negligent-failure-to-procure insurance claim must fail when the type of insurance coverage that was allegedly requested is not available. See Norman v. Allstate Prop. Cas. Ins.Co., (No. 1:06CV943 LTS-RHW, May 23, 2007) (S.D.Miss.) (not published in F.Supp.2d); Haggans v. State Farm Fire Cas. Co., 803 So.2d 1249, 1252 (Miss.Ct.App. 2002) ("[i]f no insurance could have been obtained, then a duty to procure insurance *Page 591 
could not have been breached"); and Superior AluminumAlloys, LLC v. United States Fire Ins. Co.
(No. 1:05-CV-207, June 25, 2007) (N.D.Ind.) (not published in F.Supp.2d).
With regard to this issue, Hawk argues that Mary Watts understood the type of insurance he wanted and agreed to procure that insurance coverage for him. However, as stated earlier, the record does not demonstrate that the coverage Hawk wanted in the event of a total loss of his vehicle was actually available from any insurance provider. Hawk does not argue that Mary Watts had a duty to procure insurance coverage that she could not actually obtain. Further, he does not demonstrate how he was damaged by Mary Watts's failure to procure insurance coverage that no other agent could have procured for him.Gibson v. Union Camp Corp., 519 So.2d 1355, 1355
(Ala.Civ.App. 1987) ("The rule is well settled that one cannot recover damages for the negligence of another without proving that he has been damaged and the amount of those damages."). "The substantial evidence rule requires that the nonmovant must present `substantial evidence' supporting each element of his cause of action." G.UB.MK. Constructors v. Carson,812 So.2d 1175, 1177 (Ala. 2001). Given the facts of this case and the arguments presented by the parties, we must conclude that Hawk has failed to demonstrate error with regard to his negligent-failure-to-procure-insurance claim.[3]
AFFIRMED.
PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.
[1] Nationwide and other insurers do offer "stated value" policies under certain circumstances for antique or classic vehicles.
[2] In one sentence in his argument on this issue, Hawk mentions his claim of wanton failure to procure insurance. However, because Hawk did not make any argument concerning that claim or cite any supporting authority with regard to wantonness, we must conclude that Hawk has waived any argument he might have asserted with regard to his wantonness claim.Pardue v. Potter, supra.
[3] The arguments Hawk asserts in his brief on appeal arguably support a different negligence claim than that asserted in his complaint and on appeal.