PER CURIAM.
C.D.P. (“the mother”) and D.T.P. (“the father”) (referred to collectively at times as “the parents”) are the parents of one child, O.B.P. (“the child”), who was born in November 1999. The parents lived next door to D.P. and D.S.P. (“the paternal grandparents”); the paternal grandparents frequently picked up the child from day care and often kept the child during the weekends while the mother worked.
The parents had a volatile relationship marked by domestic violence. They separated in the spring of 2002. The mother moved into an apartment after the separation. The paternal grandparents continued their habit of caring for the child on many weekends while the mother worked. In May 2002, the father broke into the mother’s residence, raped her, and attempted to kill her. The father was arrested and subsequently pleaded guilty to criminal charges arising from those acts. The mother filed a divorce action in March 2003. At that time, the relationship between the mother and the paternal grandparents began to deteriorate. In July 2003, the paternal grandparents intervened in the divorce action to seek grandparent visitation.
The mother has, at times, been an exotic dancer. She testified that she danced to earn money to support the family when the father was unable to do so and at times when she desired to earn additional money for Christmas presents for the child. The mother denied having used marijuana since she and the father were married; she admitted, however, that she and the father had used illegal drugs during their courtship. The mother testified at trial that she felt uncomfortable about the paternal grandparents having visitation with the child because of her concern that the child might be confused over the paternal grandparents’ belief that the father did nothing wrong and that the father was in jail because of the mother’s actions and not his own. The mother had requested that the paternal grandparents consider having supervised visitations; however, the mother said that the paternal grandparents refused that request and did not want to compromise with her. According to the mother, the child acted aggressively and out of character after a supervised visitation with the paternal grandparents held on the child’s birthday in November 2003. In addition, the mother commented that the paternal grandparents had hired private investigators to follow her despite *843 their failure to allege that the mother was unfit and that the paternal grandmother had advised the father to request a paternity test to prove that the child was actually his. The mother opined that the paternal grandparents had put the father’s needs and the defense of his criminal case ahead of the needs of the child.
The paternal grandmother testified at trial that she and the paternal grandfather[1] had the child “most of the time” before 2003, when the mother instituted the divorce action. When asked to be more specific about the time frame during which the paternal grandparents had cared for the child nearly every weekend, the paternal grandmother testified that it was in 2002 and that the child was 18 months to 2 years old during that period. The paternal grandmother further testified that she had not seen the child between Easter 2003 and the child’s birthday in November 2003. In November 2003, the mother permitted the paternal grandparents to have a supervised birthday visit with the child; the visit was held at the office of the mother’s attorney. According to the paternal grandmother, the child did not immediately recognize the paternal grandfather but did recognize the paternal grandmother. She said that the birthday visit was a good visit; however, she further testified that she decided not to exercise any more supervised visitations' like the birthday visitation because “it was too hard on [the child] for us to walk in and out of her lives [sic] and at the ... jerk of a person.” She noted that the child did not understand why she could not go with the paternal grandparents at the end of the visitation.
When questioned about whether she believed her son to be guilty of the violence against the mother to which he had confessed, the paternal grandmother stated that she did not believe that the'father had raped the mother or that he had attempted to kill her. She did state, during later testimony, that she believed that the father had committed some of the acts that he had confessed to and that he should be held responsible for his actions. She also said that she had not in the past disparaged, and would not in the future disparage, the mother in front of or to the child. She denied having any hostility toward the mother, stating instead that she felt pity for her. When questioned about the hiring of investigators to follow the mother, the paternal grandmother explained that she wanted to document the mother’s activities and that, although she did not care what the mother did in her personal life, she did not want the mother to “bring it home to [the child].” She stated that she was not contending that the mother was not properly rearing the child, noting that “everybody has their own views,” but said that the child should be given the opportunity to know her paternal grandparents and have a connection to her family.
The guardian ad litem for the child, B.A., testified at' trial as well. B.A. testified that the child was outgoing, “bubbly,” and very happy and that she appeared to be well-cared for by the mother. He said that he had ho concerns over the way the child was being reared or provided for by the mother. He commented that, based Pri his viewing the videotape of the child’s birthday visit with the paternal grandparents, the child appeared comfortable in the paternal grandparents’ presence and that the paternal grandmother was affectionate toward the child.
We first note that Alabama’s grandparent-visitation statute, Ala.Code 1975, § 30-3-4.1, wa's amended effective *844 September 1, 2003, only a few weeks after the paternal grandparents in the present case intervened in the pending divorce case between the parents. Although neither party mentions the amendment or questions its applicability, we will consider, briefly, whether the 2003 amendment should be applied retroactively to this case.
“[T]his Court has often noted that ‘retrospective application of a statute is generally not favored, absent an express statutory provision or clear legislative intent that the enactment apply retroactively as well as prospectively.’ This general rule is, however, subject to an equally well-established exception, namely, that ‘[remedial statutes ... are not within the legal [concept] of “retrospective laws,” ... and do operate retroactively, in the absence of language clearly showing a contrary intention.’ ”
Ex parte Bonner, 676 So.2d 925, 926 (Ala.1995) (citations and emphasis omitted). The changes in the grandparent-visitation statute effected by the 2003 amendment were substantive, not procedural or remedial, in nature, and the legislature did not clearly evidence an intent that the statute be applied retroactively. Accordingly, we decide this case under the version of § 30-3-4.1 existing at the time the paternal grandparents intervened and the caselaw interpreting that version of the statute.
The mother argues, among other things, that the paternal grandparents did not present evidence demonstrating that the child would suffer substantial harm if visitation with the paternal grandparents was not awarded. This court most recently applied the “substantial harm” test set out in Judge Murdock’s special writing in L.B.S. v. L.M.S., 826 So.2d 178, 187-92 (Ala.Civ.App.2002) (Murdock, J., concurring in the judgment of reversal only), in Richburg v. Richburg, 895 So.2d 311 (Ala.Civ.App.2004), in which we affirmed a trial court’s denial of grandparent visitation. In Richburg, a majority of the court agreed, under the narrowest reading of the law set out in L.B.S., that to be entitled to grandparent visitation under the version of Ala.Code 1975, § 30-3-4.1, in effect before its amendment in 2003, a grandparent must establish, by clear and convincing evidence, that the child would be substantially harmed by the denial of the requested visitation. Richburg, 895 So.2d at 318. After considering the evidence presented in Richburg, this court concluded that the grandparents in that case had not met that heavy burden. Id.
“Although the record demonstrates that the grandparents have been deeply involved in the child’s life, the record does not contain sufficient evidence to justify the state’s interference with the father’s fundamental right to make decisions regarding the care, custody, and control of the child. At best, the record contains a few statements by the grandmother that the two-year-old child appeared depressed or unhappy without daily contact with the grandparents.”

Id.

Likewise, in Beck v. Beck, 865 So.2d 446 (Ala.Civ.App.2003), this court addressed the substantial-harm requirement. However, in Beck, this court reversed an award of grandparent visitation on the basis that the grandparents in that ease had not shown that substantial harm would befall the child in the absence of the requested visitation. Beck, 865 So.2d at 449. The opinion in Beck also indicates that the trial court had not specifically concluded that there would be substantial harm to the child in the absence of the requested visitation. Id.
Although in both Richburg and in Beck the parent had not completely denied visitation to the grandparents and, in fact, had allowed continued visitation to a lesser ex *845 tent than that desired by the grandparents, the legal conclusion in both cases— that grandparents must do more than make general statements indicating that the child would be harmed or that the child had been “sad” or “depressed” because of the decrease in the frequency of contact with the grandparents to meet the burden of showing substantial harm — applies in equal force to this case, where the mother has denied any visitation other than the offer of supervised visitation to the paternal grandparents. The paternal grandparents in the present case have not demonstrated that the child is likely to suffer any harm by not having set visitation with them. The only evidence indicating that the child would suffer any harm at all is the statement by the paternal grandmother indicating that the child did not understand why she could not go with the paternal grandparents after the sole supervised visitation with the paternal grandparents in November 2003. After that visit, the paternal grandparents did not pursue any more supervised visits with the child. The child had not seen the paternal grandparents between April 2003 and the trial in August 2004, a period of 16 months, other than at that one visit in November 2003. No evidence, much less clear and convincing evidence, indicated that the child had suffered any harm whatsoever in the months she had been denied the chance to see her paternal grandparents. Instead, the testimony of the guardian ad litem indicated that the child was lively, bubbly, and happy and that she was being well-cared for in the custody of her mother. Accordingly, we reverse the judgment of the trial court insofar as it awards grandparent visitation and remand the cause for entry of a judgment consistent with this opinion. In light of our decision on the substantial-harm issue, we pretermit consideration of the, mother’s other arguments.
REVERSED AND REMANDED WITH INSTRUCTIONS.
' PITTMAN, MURDOCK, and BRYAN, JJ., concur.
CRAWLEY, P.J., concurs in the result, with writing.
THOMPSON, J., concurs in the result, without writing.

. The paternal grandfather did not testify.