932 So.2d 912 (2005)
Michael DODD
v.
William BURLESON and Jeanette Burleson.
2040003.
Court of Civil Appeals of Alabama.
December 16, 2005.
*913 Oliver J. Latour, Jr., Foley, for appellant.
M. Lionel Leathers of Hollis Leathers & Leathers, P.C., Winfield, for appellees.
PITTMAN, Judge.
In this appeal, we address, for the first time, the effect of the 2003 amendments to Ala.Code 1975, § 30-3-4.1, which governs actions to establish grandparental-visitation rights.

Legal Background
As the Alabama Supreme Court noted in Ex parte Bronstein, 434 So.2d 780, 782 (Ala.1983), at common law, a parent's obligation to allow visitation between his or her child and that child's grandparent was a moral obligation, not a legal one; thus, "grandparents lacked any legal right to visitation and communication with their grandchildren if such visitation was forbidden by the parents." In order to remedy the potential for injustice by a strict application of that legal principle, and in light of wider acceptance of the benefits to a child that customarily flow from that child's relationship with his or her grandparents, a number of states, including Alabama, enacted laws granting grandparents standing to seek visitation with their grandchildren in certain enumerated situations. Much of that history was summarized by Judge Thompson in his opinion for this court in Weathers v. Compton, 723 So.2d 1284 (Ala. Civ.App.1998):
"In 1980, the Alabama legislature enacted § 30-3-3, Ala.Code 1975, which abrogated th[e] common-law proposition *914 and created a right of visitation for grandparents under limited circumstances when the parents divorce. Section 30-3-3, Ala.Code 1975, provided that `[t]he presiding judge in a divorce case involving custody of children, may award, at his discretion, visitation rights to the grandparents of such children.'
"In 1983, the Alabama legislature repealed § 30-3-3 and enacted § 30-3-4, Ala.Code 1975. One aspect of the intent of the legislature in enacting the 1983 statute was to expand `grandparental rights to visitation to include the situation involving the death of one of the grandchild's parents.' Mills v. Parker, 549 So.2d 97, 98 (Ala.Civ.App.1989).
"In 1989, the Alabama legislature amended § 30-3-4, Ala.Code 1975, to give grandparents the right to intervene in any divorce action and to file a motion to modify the original divorce judgment solely for visitation rights, the right to move for a finding of contempt when the parents of the child have denied visitation rights, and the right to visitation when the parents of a child unreasonably deny grandparents visitation for a period exceeding 90 days.
"In 1995, the Alabama legislature again amended § 30-3-4, Ala.Code 1975. The Alabama legislature made the applicability of the 1995 amendment retroactive to January 1, 1989. 1995 Ala. Acts, Act No. 95-584. . . . The 1995 version of § 30-3-4 state[d, in part]:
"`At the discretion of the court, visitation privileges for grandparents of minor grandchildren shall be granted in any of the following situations:
"`"1) When the parents of the child have filed for a dissolution of their marriage or when they are divorced. A grandparent may intervene in any dissolution action solely on the issue of visitation privileges or may file a petition to modify an original decree of dissolution to seek visitation rights when those rights have not been previously established by the court.'
"(Emphasis added [in Weathers].)
"The legislature's intent in enacting the 1995 version of § 30-3-4 was `to provide visitation privileges for grandparents, those privileges presumed to be in the best interest of the child, but the presumption being rebuttable upon the consideration of the court of what is in the best interest of the child.' Act No. 95-584."
723 So.2d at 1285-86. In 1999, § 30-3-4, Ala.Code 1975, was repealed and replaced with a new statute, § 30-3-4.1, Ala.Code 1975. Under § 30-3-4.1 as originally enacted, a judgment awarding grandparental-visitation rights was statutorily permissible in five instances:
"when one or both the child's parents ha[d] died; upon the dissolution of the child's parents' marriage; upon abandonment of the child by one or both of the parents; when the child is born to unmarried parents; and when one or both of the child's parents, who are still married, use[d his, her, or] their parental authority to prohibit a relationship between the grandparent and the child."
Richburg v. Richburg, 895 So.2d 311, 315 (Ala.Civ.App.2004). However, in enacting § 30-3-4.1, the Legislature initially retained the rebuttable presumption in favor of grandparent visitation that had appeared in the 1995 amendments to § 30-3-4. Based upon its breadth, one may well refer to the original version of § 30-3-4.1 as the statutory apex of grandparental-visitation rights under Alabama law.
However, legislative efforts to foster relationships between grandparents and grandchildren have not been universally acclaimed, and a number of parents have *915 asserted that grandparental-visitation statutes such as those enacted in Alabama unconstitutionally infringe upon parental prerogatives. Although this court in 1986 rejected such an attack upon the constitutionality of the version of § 30-3-4, Ala. Code 1975, that was then in effect (see Cockrell v. Sittason, 500 So.2d 1119 (Ala. Civ.App.1986)), the United States Supreme Court's decision in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), invalidating a Washington third-party-visitation statute as applied, prompted this court, among others, to reexamine the constitutional questions raised by grandparental-visitation statutes. Although the Court issued no majority opinion in Troxel, "[e]ight Justices agreed that the Fourteenth Amendment [to the United States Constitution] protects a parent's right to raise his or her child without undue interference from government," while "[f]ive Justices agreed that a fit parent is accorded a presumption that the parent acts in the child's best interests," and "[f]our Justices ... agreed that `special factors' must `justify' the state's intrusion, and that one of those factors is a finding of parental unfitness." Linder v. Linder, 348 Ark. 322, 347, 72 S.W.3d 841, 855 (2002).
As the New Jersey Supreme Court noted in Moriarty v. Bradt, 177 N.J. 84, 109, 827 A.2d 203, 218 (2003), cert. denied, 540 U.S. 1177, 124 S.Ct. 1408, 158 L.Ed.2d 78 (2004), courts that have assessed the constitutional application of their states' grandparental-visitation statutes have typically "engaged in one of two modes of analysis: (1) interpreting the statutes to require satisfaction of a harm standard in order to overcome the presumption in favor of a fit parent's decision or (2) avoiding the articulation of any standard at all and analyzing the statutes on a case-by-case basis." Although "Troxel implied that either approach would be acceptable," id., certain members of this court, in wrestling with the question of the proper application of § 30-3-4.1 as originally enacted, have voiced support for a harm standard, as we note below. This case, however, squarely presents the question whether that standard should be held to have survived the Legislature's recent amendment of § 30-3-4.1.

Initial Procedural Background
In May 2004, William B. Burleson and Jeanette Burleson ("the grandparents"), who are the maternal grandparents of three children born to Diana Burleson Dodd ("the mother") and Michael Dodd ("the father"), filed a petition in the Marion Circuit Court seeking a pendente lite and permanent award of visitation rights with the children, the appointment of a guardian ad litem to represent the children's interests, and other appropriate relief. The grandparents alleged that the father had "made known his wishes to deny visitation rights" to the grandparents; they also averred that their visitation with the children would be in the children's best interests and would not endanger their physical or emotional health. The father answered the petition and averred that § 30-3-4.1 violated his due-process rights under the United States and Alabama Constitutions; however, he did not serve the Attorney General with a copy of his answer asserting that constitutional challenge. The grandparents then sought additional pendente lite relief upon learning that the father had moved from Marion County to Baldwin County with two of the three children.

Trial Proceedings
The trial court then held an ore tenus proceeding over three separate days in June and August 2004. The evidence adduced at those hearings tended to indicate that the father had married the grandparents' *916 daughter in 1985 and that that marriage had produced three children: an older daughter who is no longer a minor, a younger daughter who is now 16 years old, and a son who is now 7 years old. During the marriage, the father, the mother, and the children all lived in Marion County in close proximity to the grandparents. According to the daughters' testimony, the children spent a lot of time at the grandparents' residence. Specifically, in May 2001, the mother was diagnosed with breast cancer; during and after the surgical treatment of that cancer, the grandparents provided assistance in the care of the children. In October 2001, the father suffered severe injuries from a mishap involving the operation of a motorcycle; he was hospitalized for over a month and underwent physical therapy for several months thereafter, during which period the grandparents provided the bulk of the children's care.
In November 2002, the mother was again diagnosed as having cancer. However, unlike the mother's previous onset of cancer, surgical treatment was unavailable, and she died in February 2003. During the mother's final illness, relations between the father and the older daughter became strained; after the mother's death, the father began severing relationships with family friends and entered into a social relationship with a widow from Walker County, a mother of two children, whom the father would later marry. During their courtship, which involved a brief cohabitation, relations between the father and the grandparents became increasingly tense, which began to affect the previously close relationship that the grandparents had had with the children. It appears that the father resented the grandparents' profound disapproval of his eventual second wife, or at least their disapproval of the extent and rapid development of the father and his second wife's relationship, as well as the grandparents' recounting to the children their memories of the mother; the father began occasionally denying the children permission to visit with the grandparents and wrote a letter to the grandparents insisting that the grandparents "keep [their] negative comments and opinions to" themselves when the children were present.
The father married his new wife in December 2003; however, the relationship between the father and the grandparents did not improve. In fact, not only did that relationship worsen, but the father also quarreled to such an extent with the older daughter that he screamed at her, slapped her repeatedly, and directed her to move out of the family home; she was not permitted to resume living in the family home for the remainder of her minority. Matters between the father and the grandparents appeared to come to a head in late April and early May 2004; in apparent reaction to the grandparents' discussion of the mother in the son's presence, the father began denying all contact between the son and the grandparents and sent a letter to the grandparents threatening either to move from Marion County or to obtain a restraining order preventing contact between the grandparents and the two younger children. After the grandparents initiated the instant action seeking visitation rights, the son informed the grandparents that he had been forbidden to ever return to the grandparents' home.
At the first hearing in the cause, on June 22, 2004, the father, the older daughter, and the mother of one of the older daughter's friends testified. The older daughter testified, in pertinent part, that she had been kicked out of the family home after a violent quarrel but that she and the father had since been attending counseling sessions. The older daughter described the grandparents as "[w]onderful" *917 and agreed that they had been an integral part of the lives of each of the children.
The older daughter opined that the grandparents loved her "[u]nconditionally," but when asked whether the grandparents would love and take care of her siblings the same way, she responded, "They want to, but he [the father] won't let them." The older daughter testified that the grandparents had purchased a number of items for the younger sister and had attended a number of sporting and cheerleading events involving the daughters. She also testified that the son had asked her on each occasion she had seen him since she had moved out whether he could see the grandparents but that, upon being reminded of the situation, he had stated "Oh yeah. Daddy won't let me." The older daughter admitted to wishing that she could, in stealth, take her siblings to the grandparents' home to visit with them, and she testified that the children, being the grandparents' only grandchildren, were "all [the grandparents have] got left" following the mother's death.
At the second hearing, on June 28, 2004, among the witnesses called by the parties was the younger daughter. The younger daughter testified at that hearing that she and the son loved her grandparents and that she wanted the grandparents to remain a part of her life; however, she testified that she had not visited with the grandparents in four months. The younger daughter expressed a desire to see the grandparents "like we used to, when we wanted to, or when we went over" instead of, in her words, being "forced to see them any certain amount of time"; she added that she did not want either the father or the grandparents to be mad at her. The younger daughter expressed optimism that the father would not interfere with visitation between the two younger children and the grandparents, but she admitted that as of the date of the hearing she had lost the ability to simply telephone the grandparents and ask to visit them. Finally, the younger daughter testified that there had been discussions between family members about the father, his new wife, and the two younger children moving from Winfield, which is located in Marion County, but that she had been told that such a move would not happen "any time soon."
A third hearing in the cause occurred on August 11, 2004, at which all of the parties and a number of other witnesses testified. During that hearing, it was revealed that the father, his new wife, and the two younger children had moved from Winfield to Fairhope, which is located in Baldwin County, in early July 2004 and that the previous family home in Winfield had been listed with a broker for sale. The father admitted during that hearing that no relatives of the father or his new wife lived in Fairhope and that the move had been prompted by a desire to "start over" in a place free of "rumors." The father denied that the move was made solely to keep the younger children from the grandparents.
After the three hearings, the trial court entered a judgment granting the grandparents' petition on August 20, 2004. In pertinent part, the trial court's judgment referred to the significant relationship that the grandparents had had with the children, including "quasi-parental" duties as to their care during 2001; the judgment specifically determined that visitation between grandparents and the children would be in the best interests of the children. The visitation awarded consisted of the following periods: one 24-hour period every two weekends, a six-week period each summer, one week beginning on Christmas Day, one week during school spring break, three days at Thanksgiving, and one day at Easter and on Mother's *918 Day weekend. The father was directed to transport, either personally or via a designee, the children to and from the Winfield City Hall for visitation. The grandparents were also awarded reasonable telephone contact with the children. The father was also cited (but not punished) in the judgment for his contempt of particular interlocutory orders, and he was made responsible for paying an attorney fee to counsel for the grandparents and to the children's guardian ad litem.

The Father's Appeal
The father has appealed, raising seven issues in a brief filed by counsel who appeared for the first time on appeal. Of those issues, we note that four were not raised in the trial court (i.e., the validity of a visitation order apparently rendered on July 16, 2004; the allowance of the grandparents' amended complaint; the taxation of the guardian ad litem's fee to the father; and the award of an attorney fee to the grandparents). Because the father failed to preserve those issues for appellate review by raising them in the trial court, consideration of those issues by this court is pretermitted. See Birmingham Hockey Club, Inc. v. National Council on Compensation Ins., Inc., 827 So.2d 73, 80 (Ala. 2002) ("In order to be considered on appeal, issues must be presented to the trial court and to the opposing parties at the trial level.").
The father's remaining three issues each concern the propriety of the trial court's visitation award. The father first contends that Ala.Code 1975, § 30-3-4.1, as amended, is unconstitutional in its application. However, we conclude that the father's constitutional challenge is not properly presented for review. Ala.Code 1975, § 6-6-227, a portion of the Declaratory Judgment Act, states that "[i]n any proceeding ... if [a] statute ... is alleged to be unconstitutional, the Attorney General of the state shall ... be served with a copy of the proceeding and be entitled to be heard." That statute has been held to impose a jurisdictional requirement, i.e., if a statute or ordinance is alleged to be unconstitutional, a trial court may not enter a valid judgment concerning the constitutionality of the challenged statute or ordinance unless the Attorney General is served with notice of the challenge. E.g., Smith v. City of Florence, 288 Ala. 61, 62, 256 So.2d 893, 894 (1971). The father did not serve a copy of his answer challenging the constitutionality of Ala.Code 1975, § 30-3-4.1, upon the Attorney General. Thus, his constitutional challenge to § 30-3-4.1 has not been preserved for appellate review. See, e.g., Landers v. O'Neal Steel, Inc., 564 So.2d 925, 926 (Ala.1990).

The Substantive Standard
The father's second challenge to the visitation aspects of the trial court's judgment asserts that the trial court should not have, as he says, determined the question of visitation based upon a best-interests standard. It is that challenge that squarely presents for review whether § 30-3-4.1, as amended, should be held to require a showing of harm as a prerequisite for a judgment awarding grandparental visitation. For the reasons stated herein, we conclude that the application of the harm standard does not survive the Legislature's 2003 amendments to § 30-3-4.1.
In R.S.C. v. J.B.C., 812 So.2d 361 (Ala. Civ.App.2001), we reversed a judgment awarding "overnight and other unsupervised visitation rights to [a] grandfather, consisting of one weekend per month, as well as an additional day during the week preceding New Year's Day and one day for Grandparents' Day." 812 So.2d at 364. Although all five judges of this court concurred in the reversal, three judges concluded that § 30-3-4.1, as then in effect, *919 was unconstitutional as applied to the litigants in that case, whereas one judge concluded that § 30-3-4.1 was facially unconstitutional. Both the main opinion and Presiding Judge Yates's special writing in R.S.C. agreed that that portion of former § 30-3-4.1(e) setting forth a rebuttable presumption in favor of grandparental visitation was, under Troxel, unconstitutional.
In L.B.S. v. L.M.S., 826 So.2d 178 (Ala. Civ.App.2002), four judges of this court agreed that Troxel did not compel a conclusion that § 30-3-4.1 had no constitutional field of application (thereby rejecting the proposition that § 30-3-4.1 was facially unconstitutional). The main opinion (joined by two judges) indicated that § 30-3-4.1, without the presumption in favor of grandparental visitation, was "enforceable because it provides a standard the factors listed in § 30-3-4.1(d)upon which the court may rely in determining when and under what circumstances to award visitation." 826 So.2d at 187. Under the rationale set forth in the main opinion, so long as a petitioning grandparent adduced "clear and convincing evidence" that the best interests of the pertinent child would be served by awarding grandparental visitation, a trial court could properly award such visitation on a case-by-case basis. 826 So.2d at 186-87. However, two other judges who agreed that § 30-3-4.1 was not facially unconstitutional opined in L.B.S. that, as a matter of due process, a grandparent seeking a visitation judgment must make a showing of substantial harm to the child if the requested visitation is not granted. L.B.S., 826 So.2d at 187, 188 (opinions of two judges concurring in the court's judgment of reversal only). Because the "harm" class of cases amounted to a subset of the larger class of cases as to which former § 30-3-4.1 could be constitutionally applied under the main opinion in L.B.S., appellate decisions since L.B.S. pertaining to grandparental visitation have tended to analyze whether the facts in those cases fit within the narrower "harm" class. C.D.P. v. D.P., 927 So.2d 841 (Ala.Civ.App.2005), and Richburg v. Richburg, 895 So.2d 311 (Ala.Civ.App. 2004).
However, as we have intimated, the Legislature has not simply remained silent since R.S.C. and L.B.S. In 2003, the Legislature enacted Act No. 2003-383, Ala. Acts 2003, in response to the infirmities identified by this court in the aftermath of Troxel. First, in Act No. 2003-383, the Legislature removed the portion of § 30-3-4.1(e) that had provided that "[t]here shall be a rebuttable presumption in favor of visitation by any grandparent" so as to remove the language that had largely impelled this court's decision in R.S.C. concerning the constitutionality of former § 30-3-4.1. Second, the Legislature specifically amended § 30-3-4.1(d) so as to include "the wishes of any parent who is living" among the factors to be considered in determining whether the best interests of a child would be served by awarding grandparental visitation, making explicit what the main opinion in L.B.S. had held to be implicit in the general direction in former § 30-3-4.1(d)(6) that trial courts are to consider "[o]ther relevant factors" in their best-interests calculus. Notably, however, the Legislature in 2003 reaffirmed the statutory best-interests standard despite intimations from members of this court that a harm standard was constitutionally required: where § 30-3-4.1(d) formerly provided that a trial court "shall grant any grandparent of the child reasonable visitation rights if the court finds that the best interests of the child would be served by the visitation," § 30-3-4.1(d), as amended in 2003, provides that "the court shall determine if visitation by the grandparent is in the best interests of the child."
*920 We can interpret the 2003 amendments to § 30-3-4.1 only as an endorsement by the Legislature of the judiciary's use of the case-by-case approach taken by the main opinion in L.B.S. and as a simultaneous rejection of the proposition that the "harm" standard should be the touchstone by which the propriety of a judgment awarding grandparental visitation should be judged. Moreover, contrary to the position espoused in certain special writings in L.B.S., it has become clear in the five years since Troxel was decided that due process does not require a showing of harm in all cases as a prerequisite to a judgment awarding grandparental visitation. Indeed, Troxel itself appears to stand for the opposite proposition, as the Oregon Supreme Court recently noted:
"[A] majority of the Court strongly indicated [in Troxel] that the presumption in favor of a parent's decisions was not so strong that it could be overcome only by a showing that the parent poses a risk of harm to the child. As previously discussed, Justices Stevens and Kennedy each expressly rejected the Washington Supreme Court's conclusion that a finding of harm to the child is required to overcome the parental presumption.... Moreover, the plurality declined to consider the lower court's reliance on the `harm' standard ... but cited with approval various statutes that would be inconsistent with such a standard."
In re Marriage of O'Donnell-Lamont, 337 Or. 86, 101, 91 P.3d 721, 730 (2004) (emphasis added), cert. denied, 543 U.S. 1050, 125 S.Ct. 867, 160 L.Ed.2d 770 (2005).
In reaching the conclusion that under § 30-3-4.1, as amended in 2003, a harm standard is neither constitutionally required nor desired by the people of Alabama (speaking through their elected representatives in the Legislature), we follow the lead of the Kentucky Court of Appeals. That court, in Vibbert v. Vibbert, 144 S.W.3d 292 (Ky.Ct.App.2004), overruled Scott v. Scott, 80 S.W.3d 447, 451 (Ky.Ct. App.2002), which had held that "grandparent visitation may only be granted over the objection of an otherwise fit custodial parent if it is shown by clear and convincing evidence that harm to the child will result from a deprivation of visitation with the grandparent." (Footnote omitted.) The rationale in Vibbert is instructive in this case, and we adopt it as our own:
"Scott imposed an unworkable standard of proving by clear and convincing evidence that harm to the child would result from discontinuing the relationship between a child and a grandparent. We believe that the Scott court incorrectly interpreted the Troxel case ... as requiring such a strict standard, holding that the familiar `best interest' standard was no longer constitutionally permissible. However, the Supreme Court carefully avoided setting any such precedent in Troxel, as the plurality opinion of the Court explicitly stated:
"`we do not consider ... whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation.'
"Troxel[, 530 U.S. at 73, 120 S.Ct.] at 2064. Nevertheless, this Court in Scott created a standard which was, at the time, believed to satisfy the requirements of Troxel. It is the opinion of this Court now that Scott set an unnecessarily strict and unworkable standard.
"We believe that a modified `best interest' standard can be used in cases where grandparent visitation is sought within the constitutional framework of Troxel. What Troxel requires us to recognize is that a fit parent has a superior *921 right, constitutionally, to all others in making decisions regarding the raising of his or her children, including who may and may not visit them. A fit parent's decision must be given deference by the courts, and courts considering the issue must presume that a fit parent's decision is in the child's best interest.
"Where we differ from Scott is in the method by which grandparents may challenge that decision. Scott allows only one avenue for grandparents to challenge the decision, requiring them to show by clear and convincing evidence that depriving the child of visitation with the grandparent would harm the child. We believe this test to be too narrow, in that among other things it does not adequately take into account a situation where visitation is withheld by the parents out of vindictiveness.

"We now hold that the appropriate test under [the applicable grandparental-visitation statute] is that the courts must consider a broad array of factors in determining whether the visitation is in the child's best interest, including but not limited to: the nature and stability of the relationship between the child and the grandparent seeking visitation; the amount of time spent together; the potential detriments and benefits to the child from granting visitation; the effect granting visitation would have on the child's relationship with the parents; the physical and emotional health of all the adults involved, parents and grandparents alike; the stability of the child's living and schooling arrangements; the wishes and preferences of the child. The grandparent seeking visitation must prove, by clear and convincing evidence, that the requested visitation is in the best interest of the child."
144 S.W.3d at 294-95 (emphasis added).
The father's second argument assumes the continued vitality of the proposition that a case must fall within the harm subset in order for a judgment awarding grandparental visitation to be affirmed. Although that stance might have had some practical force in the legal climate existing before the Legislature's amendments to § 30-3-4.1, it is inconsistent with the conclusion we reach today concerning the effect of those amendments. Moreover, the trial court's decision to award definite visitation to the grandparents, given the factual background leading up to that court's judgment, is wholly consistent with the letter and spirit of § 30-3-4.1. Thus, to the extent that the trial court applied a "best interests" standard in conformity with § 30-3-4.1(d) that accounts for the pertinent factors specified by the Legislature, especially the wishes of a living parent such as the father, we cannot conclude that that judgment is in error.

Extent of Visitation
However, we agree with the father's third argument: that the trial court abused its discretion in requiring the particular visitation specified in that court's judgment. Under the terms of the trial court's judgment, the father's two minor children will be required to travel with the father (or his designee) between their new home in Fairhope and the Winfield City Hall, a round-trip distance of approximately 600 miles, once every two weeks for a single day of visitation, not to mention being required to spend substantial amounts of time with their grandparents during each academic-vacation period, including six weeks during the summer. While the father's actions in moving to Fairhope could properly have been determined to have been calculated to deprive the grandparents of any contact with the minor children, we cannot conclude that the proper remedy for that conduct is to impose such a rigorous visitation schedule *922 that would have such adverse effects on the minor children. Compare Mann v. Mann, 725 So.2d 989, 993 (Ala.Civ.App. 1998) (reversing, as an abuse of discretion, a visitation judgment that "require[d] the children, ages two and four, to be in the car for approximately eight hours" every other weekend).
Under the trial court's judgment, the remaining minor children are at risk of being prevented from forming and maintaining any substantial social and familial bonds in their new home community, a result that we are confident was not intended by the Legislature. In its zeal to reconstitute the previous relationship between the grandparents and the minor children, the trial court has, we feel, overlooked the overarching goal that § 30-3-4.1 was intended to achieve: furtherance of children's best interests through reasonable visitation with grandparents. As to the specific amount and terms of visitation awarded by the trial court, then, we must reverse the trial court's judgment; we remand for the trial court, being mindful of the need of the children to be a part of their new home, to craft a new judgment permitting more limited visitation with the grandparents.[1]
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, J., concurs.
CRAWLEY, P.J., concurs in the result, with writing, which BRYAN, J., joins.
MURDOCK, J., concurs in the result only, with writing.
CRAWLEY Presiding Judge, concurring in the result.
Because the father failed to preserve a constitutional challenge to § 30-3-4.1, Ala. Code 1975, and the constitutional issues are, therefore, not before us, I concur in the result. The discussion in the main opinion of what showing would be required as a matter of due process in order to award grandparental visitation under the amended statute is dictum.
BRYAN, J., concurs.
MURDOCK, Judge, concurring in the result only.
I do not agree with the main opinion's analysis of the due-process, constitutional issue discussed therein. Among other things, I particularly do not agree that the Kentucky Court of Appeals, in its decision in Vibbert v. Vibbert, 144 S.W.3d 292 (Ky. Ct.App.2004), correctly analyzed this issue. My views as to this issue continue to be as expressed in R.S.C. v. J.B.C., 812 So.2d 361 (Ala.Civ.App.2001), L.B.S. v. L.M.S., 826 So.2d 178 (Ala.Civ.App.2002) (Murdock, J., concurring in the judgment of reversal only), and subsequent cases. See also, e.g., McQuinn v. McQuinn, 866 So.2d 570, 578 (Ala.Civ.App.2003) (Murdock, J., dissenting).
Nonetheless, Presiding Judge Crawley correctly notes that the father failed to preserve a constitutional challenge to § 30-3-4.1, Ala.Code 1975, and that, therefore, "[t]he discussion in the main opinion of what showing would be required as a matter of due process in order to award grandparental visitation under the amended statute is dictum." 932 So.2d at 922 (Crawley, P.J., concurring in the result). *923 It is for this reason that I am able to concur in the result reached in the main opinion.
NOTES
[1] We note that the father has not challenged those portions of the judgment specifying that the grandparents are to have "reasonable telephone contact" with the minor children. Optimally, the role of such telephone contact in preserving a close relationship between the children and the grandparents should be considered in crafting a new visitation judgment.