967 So.2d 715 (2007)
Michael DODD
v.
William B. BURLESON and Jeanette Burleson.
No. 2050556.
Court of Civil Appeals of Alabama.
April 20, 2007.
*716 Oliver J. Latour, Jr., Foley, for appellant.
M. Lionel Leathers of Leathers Law Firm, Winfield, for appellees.
PITTMAN, Judge.
This is the second time this grandparent-visitation case has come before this court. See Dodd v. Burleson, 932 So.2d 912 (Ala.Civ.App.2005) ("Dodd I"). The two-judge main opinion in Dodd I summarized much of the pertinent legal and procedural background:
"As the New Jersey Supreme Court noted in Moriarty v. Bradt, 177 N.J. 84, 109, 827 A.2d 203, 218 (2003), cert. denied, 540 U.S. 1177 (2004), courts that have assessed the constitutional application of their states' grandparental-visitation statutes have typically `engaged in one of two modes of analysis: (1) interpreting the statutes to require satisfaction of a harm standard in order to overcome the presumption in favor of a fit parent's decision or (2) avoiding the articulation of any standard at all and analyzing the statutes on a case-by-case basis.' Although `Troxel [v. Granville, 530 U.S. 57 (2000),] implied that either approach would be acceptable,' id., certain members of this court, in wrestling with the question of the proper application of § 30-3-4.1[, Ala.Code 1975,] as originally enacted, have voiced support for a harm standard. . . . This case, however, squarely presents the question whether that standard should be held to have survived the Legislature's recent amendment of § 30-3-4.1.
"Initial Procedural Background

"In May 2004, William B. Burleson and Jeanette Burleson (`the grandparents'), who are the maternal grandparents of three children born to Diana Burleson Dodd (`the mother') and Michael *717 Dodd (`the father'), filed a petition in the Marion Circuit Court seeking a pendente lite and permanent award of visitation rights with the children, the appointment of a guardian ad litem to represent the children's interests, and other appropriate relief. The grandparents alleged that the father had `made known his wishes to deny visitation rights' to the grandparents; they also averred that their visitation with the children would be in the children's best interests and would not endanger their physical or emotional health. The father answered the petition and averred that § 30-3-4.1 violated his due-process rights under the United States and Alabama Constitutions; however, he did not serve the Attorney General with a copy of his answer asserting that constitutional challenge. The grandparents then sought additional pendente lite relief upon learning that the father had moved from Marion County to Baldwin County with two of the three children.
"Trial Proceedings

"The trial court then held an ore tenus proceeding over three separate days in June and August 2004. The evidence adduced at those hearings tended to indicate that the father had married the grandparents' daughter in 1985 and that that marriage had produced three children: an older daughter who is no longer a minor, a younger daughter who is now 16 years old, and a son who is now 7 years old. During the marriage, the father, the mother, and the children all lived in Marion County in close proximity to the grandparents. According to the daughters' testimony, the children spent a lot of time at the grandparents' residence. Specifically, in May 2001, the mother was diagnosed with breast cancer; during and after the surgical treatment of that cancer, the grandparents provided assistance in the care of the children. In October 2001, the father suffered severe injuries from a mishap involving the operation of a motorcycle; he was hospitalized for over a month and underwent physical therapy for several months thereafter, during which period the grandparents provided the bulk of the children's care.
"In November 2002, the mother was again diagnosed as having cancer. However, unlike the mother's previous onset of cancer, surgical treatment was unavailable, and she died in February 2003. During the mother's final illness, relations between the father and the older daughter became strained; after the mother's death, the father began severing relationships with family friends and entered into a social relationship with a widow from Walker County, a mother of two children, whom the father would later marry. During their courtship, which involved a brief cohabitation, relations between the father and the grandparents became increasingly tense, which began to affect the previously close relationship that the grandparents had had with the children. It appears that the father resented the grandparents' profound disapproval of his eventual second wife, or at least their disapproval of the extent and rapid development of the father and his second wife's relationship, as well as the grandparents' recounting to the children their memories of the mother; the father began occasionally denying the children permission to visit with the grandparents and wrote a letter to the grandparents insisting that the grandparents `keep [their] negative comments and opinions to' themselves when the children were present.
"The father married his new wife in December 2003; however, the relationship between the father and the grandparents did not improve. In fact, not *718 only did that relationship worsen, but the father also quarreled to such an extent with the older daughter that he screamed at her, slapped her repeatedly, and directed her to move out of the family home; she was not permitted to resume living in the family home for the remainder of her minority. Matters between the father and the grandparents appeared to come to a head in late April and early May 2004; in apparent reaction to the grandparents' discussion of the mother in the son's presence, the father began denying all contact between the son and the grandparents and sent a letter to the grandparents threatening either to move from Marion County or to obtain a restraining order preventing contact between the grandparents and the two younger children. After the grandparents initiated the instant action seeking visitation rights, the son informed the grandparents that he had been forbidden to ever return to the grandparents' home.
"At the first hearing in the cause, on June 22, 2004, the father, the older daughter, and the mother of one of the older daughter's friends testified. The older daughter testified, in pertinent part, that she had been kicked out of the family home after a violent quarrel but that she and the father had since been attending counseling sessions. The older daughter described the grandparents as `[w]onderful' and agreed that they had been an integral part of the lives of each of the children.
"The older daughter opined that the grandparents loved her `[u]nconditionally,' but when asked whether the grandparents would love and take care of her siblings the same way, she responded, `They want to, but he [the father] won't let them.' The older daughter testified that the grandparents had purchased a number of items for the younger sister and had attended a number of sporting and cheerleading events involving the daughters. She also testified that the son had asked her on each occasion she had seen him since she had moved out whether he could see the grandparents but that, upon being reminded of the situation, he had stated[,] `Oh yeah. Daddy won't let me.' The older daughter admitted to wishing that she could, in stealth, take her siblings to the grandparents' home to visit with them, and she testified that the children, being the grandparents' only grandchildren, were `all [the grandparents have] got left' following the mother's death.
"At the second hearing, on June 28, 2004, among the witnesses called by the parties was the younger daughter. The younger daughter testified at that hearing that she and the son loved her grandparents and that she wanted the grandparents to remain a part of her life; however, she testified that she had not visited with the grandparents in four months. The younger daughter expressed a desire to see the grandparents `like we used to, when we wanted to, or when we went over' instead of, in her words, being `forced to see them any certain amount of time'; she added that she did not want either the father or the grandparents to be mad at her. The younger daughter expressed optimism that the father would not interfere with visitation between the two younger children and the grandparents, but she admitted that as of the date of the hearing she had lost the ability to simply telephone the grandparents and ask to visit them. Finally, the younger daughter testified that there had been discussions between family members about the father, his new wife, and the two younger children moving from Winfield, which is located in Marion County, but that she had been told that such a move would not happen `any time soon.'

*719 "A third hearing in the cause occurred on August 11, 2004, at which all of the parties and a number of other witnesses testified. During that hearing, it was revealed that the father, his new wife, and the two younger children had moved from Winfield to Fairhope, which is located in Baldwin County, in early July 2004 and that the previous family home in Winfield had been listed with a broker for sale. The father admitted during that hearing that no relatives of the father or his new wife lived in Fairhope and that the move had been prompted by a desire to `start over' in a place free of `rumors.' The father denied that the move was made solely to keep the younger children from the grandparents.
"After the three hearings, the trial court entered a judgment granting the grandparents' petition on August 20, 2004. In pertinent part, the trial court's judgment referred to the significant relationship that the grandparents had had with the children, including `quasi-parental' duties as to their care during 2001; the judgment specifically determined that visitation between grandparents and the children would be in the best interests of the children. The visitation awarded consisted of the following periods: one 24-hour period every two weekends, a six-week period each summer, one week beginning on Christmas Day, one week during school spring break, three days at Thanksgiving, and one day at Easter and on Mother's Day weekend. The father was directed to transport, either personally or via a designee, the children to and from the Winfield City Hall for visitation. The grandparents were also awarded reasonable telephone contact with the children. The father was also cited (but not punished) in the judgment for his contempt of particular interlocutory orders, and he was made responsible for paying an attorney fee to counsel for the grandparents and to the children's guardian ad litem."
Dodd I, 932 So.2d at 915-18.
The main opinion in Dodd I pretermitted review of four issues that had not been preserved at the trial level (the validity of a visitation order apparently rendered on July 16, 2004; the allowance of the grandparents' amended complaint; the taxation of the guardian ad litem's fee to the father; and the award of an attorney fee to the grandparents), and opined that the father's direct challenge to § 30-3-4.1, as applied to him, was foreclosed because he had failed to serve the Attorney General with a copy of his answer. 932 So.2d at 918. The main opinion in Dodd I did, however, review (and reject) the father's argument that a harm standard should be applied to the grandparents' visitation request:
"The father's second challenge to the visitation aspects of the trial court's judgment asserts that the trial court should not have, as he says, determined the question of visitation based upon a best-interests standard. It is that challenge that squarely presents for review whether § 30-3-4.1, as amended, should be held to require a showing of harm as a prerequisite for a judgment awarding grandparental visitation. For the reasons stated herein, we conclude that the application of the harm standard does not survive the Legislature's 2003 amendments to § 30-3-4.1.
"In R.S.C. v. J.B.C., 812 So.2d 361 (Ala.Civ.App.2001), we reversed a judgment awarding `overnight and other unsupervised visitation rights to [a] grandfather, consisting of one weekend per month, as well as an additional day during the week preceding New Year's Day and one day for Grandparents' Day.' 812 So.2d at 364. Although all five judges of this court concurred in the reversal, three judges concluded that § 30-3-4.1, *720 as then in effect, was unconstitutional as applied to the litigants in that case, whereas one judge concluded that § 30-3-4.1 was facially unconstitutional. Both the main opinion and Presiding Judge Yates's special writing in R.S.C. agreed that that portion of former § 30-3-4.1(e) setting forth a rebuttable presumption in favor of grandparental visitation was, under Troxel [v. Granville, 530 U.S. 57, 120 S.Ct. 2054 (2000)], unconstitutional.
"In L.B.S. v. L.M.S., 826 So.2d 178 (Ala.Civ.App.2002), four judges of this court agreed that Troxel did not compel a conclusion that § 30-3-4.1 had no constitutional field of application (thereby rejecting the proposition that § 30-3-4.1 was facially unconstitutional). The main opinion (joined by two judges) indicated that § 30-3-4.1, without the presumption in favor of grandparental visitation, was `enforceable because it provides a standard  the factors listed in § 30-3-4.1(d)  upon which the court may rely in determining when and under what circumstances to award visitation.' 826 So.2d at 187. Under the rationale set forth in the main opinion, so long as a petitioning grandparent adduced `clear and convincing evidence' that the best interests of the pertinent child would be served by awarding grandparental visitation, a trial court could properly award such visitation on a case-by-case basis. 826 So.2d at 186-87. However, two other judges who agreed that § 30-3-4.1 was not facially unconstitutional opined in L.B.S. that, as a matter of due process, a grandparent seeking a visitation judgment must make a showing of substantial harm to the child if the requested visitation is not granted. L.B.S., 826 So.2d at 187, 188 (opinions of two judges concurring in the court's judgment of reversal only). Because the `harm' class of cases amounted to a subset of the larger class of cases as to which former § 30-3-4.1 could be constitutionally applied under the main opinion in L.B.S., appellate decisions since L.B.S. pertaining to grandparental visitation have tended to analyze whether the facts in those cases fit within the narrower `harm' class. C.D.P. v. D.P., 927 So.2d 841 (Ala.Civ.App.2005), and Richburg v. Richburg, 895 So.2d 311 (Ala.Civ.App. 2004).
"However, as we have intimated, the Legislature has not simply remained silent since R.S.C. and L.B.S. In 2003, the Legislature enacted Act No. 2003-383, Ala. Acts 2003, in response to the infirmities identified by this court in the aftermath of Troxel. First, in Act No. 2003-383, the Legislature removed the portion of § 30-3-4.1(e) that had provided that `[t]here shall be a rebuttable presumption in favor of visitation by any grandparent' so as to remove the language that had largely impelled this court's decision in R.S.C. concerning the constitutionality of former § 30-3-4.1. Second, the Legislature specifically amended § 30-3-4.1(d) so as to include `the wishes of any parent who is living' among the factors to be considered in determining whether the best interests of a child would be served by awarding grandparental visitation, making explicit what the main opinion in L.B.S. had held to be implicit in the general direction in former § 30-3-4.1(d)(6) that trial courts are to consider `[o]ther relevant factors' in their best-interests calculus. Notably, however, the Legislature in 2003 reaffirmed the statutory best-interests standard despite intimations from members of this court that a harm standard was constitutionally required: where § 30-3-4.1(d) formerly provided that a trial court `shall grant any grandparent of the child reasonable visitation rights if the court finds that the best interests of the child would be served by the *721 visitation,' § 30-3-4.1(d), as amended in 2003, provides that `the court shall determine if visitation by the grandparent is in the best interests of the child.'
"We can interpret the 2003 amendments to § 30-3-4.1 only as an endorsement by the Legislature of the judiciary's use of the case-by-case approach taken by the main opinion in L.B.S. and as a simultaneous rejection of the proposition that the `harm' standard should be the touchstone by which the propriety of a judgment awarding grandparental visitation should be judged. Moreover, contrary to the position espoused in certain special writings in L.B.S., it has become clear in the five years since Troxel was decided that due process does not require a showing of harm in all cases as a prerequisite to a judgment awarding grandparental visitation. Indeed, Troxel itself appears to stand for the opposite proposition, as the Oregon Supreme Court recently noted:
"`[A] majority of the Court strongly indicated [in Troxel] that the presumption in favor of a parent's decisions was not so strong that it could be overcome only by a showing that the parent poses a risk of harm to the child. As previously discussed, Justices Stevens and Kennedy each expressly rejected the Washington Supreme Court's conclusion that a finding of harm to the child is required to overcome the parental presumption. . . . Moreover, the plurality declined to consider the lower court's reliance on the "harm" standard . . . but cited with approval various statutes that would be inconsistent with such a standard.'
"In re Marriage of O'Donnell-Lamont, 337 Or. 86, 101, 91 P.3d 721, 730 (2004) (emphasis added), cert. denied, 543 U.S. 1050, 125 S.Ct. 867, 160 L.Ed.2d 770 (2005).
"In reaching the conclusion that under § 30-3-4.1, as amended in 2003, a harm standard is neither constitutionally required nor desired by the people of Alabama (speaking through their elected representatives in the Legislature), we follow the lead of the Kentucky Court of Appeals. That court, in Vibbert v. Vibbert, 144 S.W.3d 292 (Ky.Ct.App.2004), overruled Scott v. Scott, 80 S.W.3d 447, 451 (Ky.Ct.App.2002), which had held that `grandparent visitation may only be granted over the objection of an otherwise fit custodial parent if it is shown by clear and convincing evidence that harm to the child will result from a deprivation of visitation with the grandparent.' (Footnote omitted.) The rationale in Vibbert is instructive in this case, and we adopt it as our own:
"`Scott imposed an unworkable standard of proving by clear and convincing evidence that harm to the child would result from discontinuing the relationship between a child and a grandparent. We believe that the Scott court incorrectly interpreted the Troxel case . . . as requiring such a strict standard, holding that the familiar "best interest" standard was no longer constitutionally permissible. However, the Supreme Court carefully avoided setting any such precedent in Troxel, as the plurality opinion of the Court explicitly stated:
"`"we do not consider . . . whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation."
"`Troxel[, 530 U.S. at 73, 120 S.Ct.] at 2064. Nevertheless, this Court in Scott created a standard which was, at the time, believed to satisfy the requirements of Troxel. It is the opinion of this Court now that Scott set an *722 unnecessarily strict and unworkable standard.
"`We believe that a modified "best interest" standard can be used in cases where grandparent visitation is sought within the constitutional framework of Troxel. What Troxel requires us to recognize is that a fit parent has a superior right, constitutionally, to all others in making decisions regarding the raising of his or her children, including who may and may not visit them. A fit parent's decision must be given deference by the courts, and courts considering the issue must presume that a fit parent's decision is in the child's best interest.
"`Where we differ from Scott is in the method by which grandparents may challenge that decision. Scott allows only one avenue for grandparents to challenge the decision, requiring them to show by clear and convincing evidence that depriving the child of visitation with the grandparent would harm the child. We believe this test to be too narrow, in that among other things it does not adequately take into account a situation where visitation is withheld by the parents out of vindictiveness.

"`We now hold that the appropriate test under [the applicable grandparental-visitation statute] is that the courts must consider a broad array of factors in determining whether the visitation is in the child's best interest, including but not limited to: the nature and stability of the relationship between the child and the grandparent seeking visitation; the amount of time spent together; the potential detriments and benefits to the child from granting visitation; the effect granting visitation would have on the child's relationship with the parents; the physical and emotional health of all the adults involved, parents and grandparents alike; the stability of the child's living and schooling arrangements; the wishes and preferences of the child. The grandparent seeking visitation must prove, by clear and convincing evidence, that the requested visitation is in the best interest of the child.'"
"144 S.W.3d at 294-95 (emphasis added [in Dodd I]).
"The father's second argument assumes the continued vitality of the proposition that a case must fall within the harm subset in order for a judgment awarding grandparental visitation to be affirmed. Although that stance might have had some practical force in the legal climate existing before the Legislature's amendments to § 30-3-4.1, it is inconsistent with the conclusion we reach today concerning the effect of those amendments. Moreover, the trial court's decision to award definite visitation to the grandparents, given the factual background leading up to that court's judgment, is wholly consistent with the letter and spirit of § 30-3-4.1. Thus, to the extent that the trial court applied a `best interests' standard in conformity with § 30-3-4.1(d) that accounts for the pertinent factors specified by the Legislature, especially the wishes of a living parent such as the father, we cannot conclude that that judgment is in error."
Dodd I, 932 So.2d at 918-21.
Although the main opinion in Dodd I rejected the "harm" standard, it did sustain the father's argument that in awarding the grandparents visitation, the trial court was acting outside its discretion:
"Under the terms of the trial court's judgment, the father's two minor children will be required to travel with the father (or his designee) between their new home in Fairhope and the Winfield City Hall, a round-trip distance of approximately *723 600 miles, once every two weeks for a single day of visitation, not to mention being required to spend substantial amounts of time with their grandparents during each academic-vacation period, including six weeks during the summer. While the father's actions in moving to Fairhope could properly have been determined to have been calculated to deprive the grandparents of any contact with the minor children, we cannot conclude that the proper remedy for that conduct is to impose such a rigorous visitation schedule that would have such adverse effects on the minor children. Compare Mann v. Mann, 725 So.2d 989, 993 (Ala.Civ.App.1998) (reversing, as an abuse of discretion, a visitation judgment that `require[d] the children, ages two and four, to be in the car for approximately eight hours' every other weekend).
"Under the trial court's judgment, the remaining minor children are at risk of being prevented from forming and maintaining any substantial social and familial bonds in their new home community, a result that we are confident was not intended by the Legislature. In its zeal to reconstitute the previous relationship between the grandparents and the minor children, the trial court has, we feel, overlooked the overarching goal that § 30-3-4.1 was intended to achieve: furtherance of children's best interests through reasonable visitation with grandparents. As to the specific amount and terms of visitation awarded by the trial court, then, we must reverse the trial court's judgment; we remand for the trial court, being mindful of the need of the children to be a part of their new home, to craft a new judgment permitting more limited visitation with the grandparents."
932 So.2d at 921-22 (footnote omitted).
One judge concurred in the main opinion in Dodd I, and three judges concurred in the result. Presiding Judge Crawley, joined by Judge Bryan, opined in a special writing that the main opinion unnecessarily discussed "what showing would be required as a matter of due process in order to award grandparental visitation under the amended statute," while Judge Murdock indicated his continued adherence to his views expressed in R.S.C. and L.B.S. 932 So.2d at 922.
On remand from Dodd I, the trial court entered a new visitation judgment. In pertinent part, the judgment on remand provides that the grandparents are to have (1) "summer visitation" consisting of "[f]ourteen days during the non-school months in two seven-day increments," as to which "[t]he father . . . shall . . . give written notice by certified mail to the . . . grandparents . . . of the two periods that he deems would least interfere with the formation and maintenance of the minor children's social and familial bonds in their new home community"; (2) Christmas visitation "[f]rom 12:00 noon December 27th to 12:00 noon January 1st, New Year's Day, a period of five days"; (3) Thanksgiving visitation "[f]rom 12 noon on the Friday after Thanksgiving to 12:00 noon Sunday, a period of two days"; and (4) spring-break visitation "[f]rom 12:00 noon on Saturday of the break until 12:00 noon Wednesday, a period of four days." After noting that it had specifically awarded visitation equaling 25 days, or approximately "6.85% of a calendar year," the trial court also noted that the grandparents were to have "additional" visitation "at other reasonable times and places to be exercised in Baldwin County, Mobile [County] or the Florida panhandle" upon giving 60 days' advance notice by certified mail to the father, whereupon the father would have 30 days within which to deny the requested visitation by "specifically stating [his] reasons" for doing so. The parties were directed to exchange the children for visitation *724 in Prattville, Alabama, unless otherwise agreed. The grandparents were also awarded "reasonable telephone contact" with the children, which that court defined as "a telephone call placed by the [grandparents] to [the father's] home telephone number on alternating days with the [grandparents'] actually speaking with each child for a minimum of 10 minutes without interruption or excuse."[1] The grandparents were also granted the right to "reasonable contact with their grandchildren in public venues."
The father again appeals. He first posits that the visitation schedule set forth on remand is not "reasonable" within the mandate of the main opinion's instructions in Dodd I. We disagree; the trial court has substantially reduced a visitation award that would have resulted in the children traveling back and forth across Alabama once every two weekends and every Easter and Mother's Day, as well as requiring them to spend six weeks away from home each summer and one week each winter and spring academic break. Limiting the grandparents to in-person visitation of 14 days in the summer and 11 days during fall and spring school terms, apart from visitation approved by the father, seems to us to be well within the realm of a "reasonable" award of visitation within the meaning of Dodd I.
The father also contends that the visitation awarded on remand exceeds "that which was reasonably necessary to avoid . . . harm." In so contending, the father expressly invokes the "harm" standard as evoked by the special writings in R.S.C. v. J.B.C., 812 So.2d 361 (Ala.Civ. App.2001), and L.B.S. v. L.M.S., 826 So.2d 178 (Ala.Civ.App.2002) (as well as Judge Murdock's dissenting opinion in K.S. v. H.S., 900 So.2d 1223 (Ala.Civ.App.2004))  a standard the main opinion in Dodd I noted was not consistent with the Legislature's intent in amending § 30-3-4.1. Because there may be some confusion engendered by the fact that Dodd I was not a majority opinion, we take this opportunity, as a court, to expressly and unequivocally reaffirm the principles espoused in the main opinion in Dodd I: (a) that the Legislature, by amending § 30-3-4.1, espoused the judiciary's use of the case-by-case approach taken by the main opinion in L.B.S. as to the propriety of a specific award of grandparental visitation, rather than endorsing the "harm" standard; (b) that due process does not require a showing of harm in all cases as a prerequisite to a judgment awarding grandparental visitation; and (c) that, in lieu of applying a "strict and unworkable" harm standard, courts must consider a "broad array of factors" in determining whether the visitation with the grandparents is in the child's best interests.[2] Because the father's invocation of the discarded "harm" standard is inconsistent with the main opinion in Dodd I and with § 30-3-4.1 as amended, his argument is fundamentally flawed, and we reject it.
The father further argues, in other portions of his brief, that the trial court's judgment on remand is erroneous because, he says, the trial court "fail[ed] to consider the wishes of a fit parent," a factor specified in § 30-3-4.1(d)(6) as a component of the 2003 amendment to that statute. At *725 trial, when the father was asked what visitation between the grandparents and the children, if any, he believed would be appropriate, he replied that visitation during school weeks would "probably be out of the question"; that he wanted the children "to be able to go to the worship service that they choose to go to at their new home"; and that as to weekends, he had "no problems with [the grandparents] coming down [to Fairhope] and seeing those kids, just so it doesn't disrupt their whole lives." According to the father's brief, the trial court "simply did not in any way take into consideration the wishes of" the father by awarding visitation that did not precisely conform to that testimony.
The father's argument is not sound. The trial court could well have concluded, consistent with § 30-3-4.1(d)(6), that the father's concerns regarding the children's involvement in school and in church activities were well founded, and that court's judgment on remand reflects a salutary regard for those concerns in that it limits visitation to academic break periods scattered through the calendar year. The trial court could simultaneously have properly determined, notwithstanding the father's desire that the grandparents come to Fairhope, that the children should spend "guaranteed" visitation periods with the grandparents[3] in Winfield, the community in which the children had spent their entire lives before the father remarried and chose to relocate, and we reject the father's intimation that the location of the visitation expressly ordered reflects a complete disregard for the father's wishes in contravention of § 30-3-4.1(d)(6).
The father also objects to certain other provisions of the trial court's order on remand. The father's arguments regarding what he terms "oppressive" telephone-contact guarantees under the trial court's judgment on remand are supported, if at all, by only general citations to Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), R.S.C., and L.B.S., and by anecdotal remarks concerning what telephone contact might normally be awarded a parent in a custody order involving two divorcing parents. "Citations to general authority do not meet the requirements of Rule 28, Ala. R.App. P.," regarding the adequacy of arguments to warrant substantive appellate review. Stockton v. CKPD Dev. Co., LLC, 936 So.2d 1065, 1078-79 (Ala.Civ.App.2005).
The father also complains of various provisions incorporated into the judgment on remand that first appeared in the trial court's original judgment, including provisions restraining the parties from disparaging one another, directing the parties to cooperate, mandating that the father provide the grandparents with a copy of the children's medical-insurance cards for use in emergencies, stipulating that the parties will notify one another of emergencies involving the children, and requiring the father to provide the grandparents with copies of the children's academic calendars and written notices of the time and nature of their activities. The propriety of those specific additional provisions was not raised on the initial appeal in this case; consequently, we do not reach that issue in this second appeal. See Bankruptcy Auths., Inc. v. State, 620 So.2d 626, 627 *726 (Ala.1993) (failure of appellant to raise issue in first appeal pertaining to error allegedly existing in judgment barred review of that issue on second appeal).
As the foregoing history, facts, and authorities reveal, this appeal, when stripped to its essence, presents a simple question: Did the trial court act correctly in entering a judgment on remand from this court in Dodd I that afforded the grandparents substantially less in terms of guaranteed visitation than its previous judgment had? Because we are convinced that the judgment on remand "further[s][the] children's best interests through reasonable visitation with [the] grandparents," Dodd I, 932 So.2d at 922, we answer that question in the affirmative. The trial court's judgment is therefore affirmed.
AFFIRMED.
THOMPSON, P.J., concurs.
MOORE, J., concurs in the result, with writing, which BRYAN and THOMAS, JJ., join.
MOORE, Judge, concurring in the result.
As Judge Murdock, Judge Crawley, and Judge Bryan, concurring in the result in the earlier opinion in this case, concluded, this case does not involve a consideration of the constitutionality of § 30-3-4.1, Ala. Code 1975. Dodd v. Burleson, 932 So.2d 912, 922-23 (Ala.Civ.App.2005) ("Dodd I"). Hence, this case is not an appropriate vehicle for this court to settle the question of whether § 30-3-4.1 offends the Due Process Clause of the Fourteenth Amendment by not requiring a showing of substantial harm in all cases as a prerequisite to awarding grandparental visitation. Therefore, I cannot join in the main opinion's decision to "reaffirm" the principles set out in Dodd I, which were dictum in that opinion.
This case involves the simple question of whether the trial court, on remand, properly complied with this court's order that it craft a reasonable visitation order that would serve the best interests of the children. Section 30-3-4.1 sets out factors the trial court must consider when determining whether grandparents should be given visitation rights; it does not create any standards regarding the mode or manner of visitation or establish any factors a trial court must consider when fashioning its visitation order. The statute is silent as to the procedure to be followed once the trial court has determined it is in the best interests of the child to have visitation with the grandparents.
Apparently, the Legislature, in amending § 30-3-4.1, intended that the appropriateness of the method and manner of grandparent visitation would be determined as under preexisting law. Alabama law has long held that when granting visitation to grandparents, the trial court has broad discretion in determining the mode of the visitation, the duration of the visitation, the location of the visitation, the scope of the visitation, and any restrictions or conditions on the visitation based on the best interests of the children, and its order will be reversed only if it abuses that discretion. See, e.g., Cockrell v. Sittason, 500 So.2d 1119 (Ala.Civ.App.1986). The father has failed to show that the trial court's visitation plan was unreasonable and thus an abuse of its discretion. Accordingly, although I cannot concur in all respects with the analysis in the main opinion, I concur in the decision to affirm the trial court's visitation order as revised on remand.
BRYAN and THOMAS, JJ., concur.
NOTES
[1] Similar telephone contact with the children was afforded to the father during periods the children were visiting with the grandparents.
[2] Of course, in citing Vibbert v. Vibbert, 144 S.W.3d 292 (Ky.Ct.App.2004), with approval, the main opinion in Dodd I should not be interpreted as favoring the "array of factors" stated in Vibbert over the factors specified by the Alabama Legislature in § 30-3-4.1(d). To the extent of any conflict that might exist between the two lists of factors, those specified in § 30-3-4.1(d) would be binding upon Alabama courts.
[3] Of course, any additional agreed-to visitation under the judgment on remand that the father permits to take place will be within Mobile and Baldwin Counties or in northwest Florida, locations in relatively close proximity to Fairhope. Although the father seizes upon that provision as indicating that the trial court disregarded his wishes regarding the place of visitation, that provision is properly viewed as deferring to the father's wishes as to how closely to limit any other visitation outside the guaranteed visitation between the grandparents and the children.